IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 15, 2010 Session[1]

## IN RE SAMARIA S. AND SAMARION S.

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v.
## TIKINDRA G.

**An Appeal from the Circuit Court for Madison County**
**No. C09-241      Roger A. Page, Judge**

_____

**No. W2010-00421-COA-R3-JV - Filed March 8, 2011**

_____

This is a dependency and neglect appeal from a finding of severe child abuse. The respondent mother gave birth to premature twins. Before the hospital released the premature infants to the mother's care, she was given extensive instructions on their feeding. Two weeks later, one twin was hospitalized, near death from severe malnutrition and dehydration. Days later, the other twin was hospitalized, also severely malnourished and dehydrated. The twins were taken into State protective custody, and a petition for dependency and neglect was filed, alleging severe child abuse. The mother stipulated to dependency and neglect, but denied severe child abuse. The juvenile court held that the first twin had been subjected to severe child abuse, but not the second twin. The mother appealed this finding to the circuit court. After a *de novo* hearing, the circuit court held that both twins had been subjected to "severe child abuse" as defined in Tennessee Code Annotated § 37-1-102(b)(23)(A) and (B). The mother now appeals. We affirm, finding, *inter alia*, that subsection (B) of the statute does not require proof that the mother's conduct was "knowing" in order to find severe child abuse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

---

[1]At oral argument in this cause, counsel for both parties were directed to submit supplemental briefs to the Court. The Court appreciates the parties' submission of supplemental briefs.

Charles L. Holliday, Jackson, Tennessee, for the Respondent/Appellant, Tikindra G.

Robert E. Cooper, Jr., Attorney General & Reporter, and Douglas Earl Dimond, Senior Counsel, for the Petitioner/Appellee, State of Tennessee, Department of Children's Services

Lanis L. Karnes, Jackson, Tennessee, Guardian Ad Litem

## OPINION

### FACTS AND PROCEEDINGS BELOW

On July 9, 2007, Respondent/Appellant Tikindra G. ("Mother"), twenty years old at the time, gave birth to twins, Samarion S. ("Boy Twin") and Samaria S. ("Girl Twin"). At the time, Mother already had two other children, ages one and two.[2] Although Mother maintained an "on again and off again" relationship with the twins' father, Siarron S. ("Father"), Mother and Father were never married.[3]

The twins were born four to six weeks prematurely, at about thirty-four weeks gestation. Each weighed about four pounds at birth. Consequently, they spent their first two weeks in the Neonatal Intensive Care Unit ("NIC Unit") of the Jackson Madison County Hospital ("Hospital"). Initially, the newborn twins had difficulty feeding, but this problem largely resolved while they were in the Hospital. Before the Hospital would permit the premature babies to be released to Mother, NIC Unit personnel recommended that Mother "room in" with them, that is, spend a night in the Hospital with the babies and be responsible for all of their feedings while under the supervision of medical professionals. The purpose of "rooming in" was to ensure that Mother was adequately prepared to meet the nutritional needs of the premature infants after returning home.

Mother was scheduled to room in with the babies the night of July 21, 2007, in anticipation of their scheduled release the next day. She told the Unit nurse that she would arrive at the Hospital around 7:30 p.m. However, Mother did not actually arrive at the Hospital until 1:10 a.m. that night, and she brought one of the twins' older siblings with her. After Mother arrived, she left again and returned at 3:00 a.m., again with the older sibling. At that point, Hospital personnel reiterated to Mother that she had to stay with the babies for a full night before they could be released, so her overnight stay was rescheduled for the next night, July

---

[2]Mother gave birth to her fifth child on January 13, 2009.

[3]Father is the biological father of all of Mother's children except her oldest. Some evidence indicates that Father was physically and verbally abusive toward Mother. Mother is no longer in a relationship with Father.

22, 2007. That night, Mother arrived at 11:30 p.m., but left the Hospital at 12:30 a.m. to eat, returning at 2:00 a.m., and was gone again between 4:10 a.m. and 6:20 a.m. to be at her home with her older children.

The Hospital did not attempt to schedule another overnight stay for Mother. However, while the twins were in the Hospital, Mother was given extensive instruction on how to feed and care for them once she brought them home, including both written and verbal instructions by the NIC Unit. Mother indicated that she understood the instructions, and she signed an acknowledgement for the discharge nurse stating that she understood the care and feeding instructions. The babies' treating physician wrote an order for home health services to be provided to Mother to assist her after the premature infants were released from the Hospital by providing nursing visits, weight checks, and other assistance with feeding and care. Under these conditions, the babies were released to Mother's care. Girl Twin was released from the NIC Unit on July 23, 2007, and Boy Twin was released two days later on July 25, 2007.

The address Mother had given the Hospital was the address for Mother's grandmother at 2465 Steam Mill Ferry Road. Mother and her children were residing there temporarily, because the utilities in Mother's apartment had been cut off. On July 26, 2007, the day after Boy Twin was released, home health professionals came to the Steam Mill Ferry address to discuss with Mother the services that had been scheduled for her premature infants. In the meeting, Mother signed a consent form for further home health services. The next day, on July 27, 2007, Mother brought the twins to their pediatrician for a checkup. The checkup indicated no problems with the twin babies at that time.

During the next week, the home health professionals came to the Steam Mill Ferry address to provide Mother and the premature infants with the scheduled in-home services. When they arrived, Mother's grandmother told them that Mother and the children were no longer living there and that the grandmother did not know Mother's whereabouts. Consequently, the scheduled home health services were not provided to Mother and the babies.

Unbeknownst to either Hospital personnel or the home health services personnel, Mother had moved with her four children into the home of her friend, Quintora "Quinn" Miller ("Ms. Miller"), at 907 Park Place Apartments in Jackson, Tennessee. Ms. Miller lived at the Park Place Apartment with her own three children. After moving in with Ms. Miller, Mother returned to work at her hourly wage job, working about six hours a day. While Mother was at work, she left the twins in the care of either Father or Ms. Miller.

During the almost-two-week period following the babies' initial checkup with their pediatrician, the twins' health plummeted. By August 9, 2007, Boy Twin's condition had

become dire; while at home with Mother, he went into respiratory distress and his eyes rolled into the back of his head. After Mother called 911, Boy Twin was transported to the Hospital. When Boy Twin arrived at the Hospital, he was near death. His temperature was 86 degrees,[4] and he had no subcutaneous fat, only skin hanging on his bones. CPR was administered, and the child was intubated and placed on a ventilator in the pediatric intensive care unit ("PIC Unit"). He received blood transfusions on both August 9 and 10, 2007. Boy Twin was diagnosed with having had a life-threatening event and malnutrition/failure to thrive. Mother apparently did little or no visiting Boy Twin while he was hospitalized.

On August 14, 2007, while Boy Twin was still in the hospital, Petitioner/Appellee State of Tennessee, Department of Children's Services ("DCS"), received a referral on Girl Twin. Child Protective Services ("CPS") investigator Doretha Brice ("Brice") was assigned to the case. Initially, Brice was unable to locate Girl Twin because Mother was not visiting Boy Twin in the hospital and Mother had not given the home health service her address after she moved from her grandmother's home. On the morning of August 16, 2007, Brice finally located Mother and Girl Twin at the home of Ms. Miller. When Brice explained to Mother that the home health agency had been unable to locate her to assess Girl Twin, Mother admitted to Brice that she had not given the home health agency her new address.

While Boy Twin was being treated at the Hospital, Girl Twin's condition had continued to decline. Later during the same day that Brice visited Mother, while Girl Twin was in Father's care, Girl Twin was taken to the Hospital. Upon admission, her condition was nearly the same as Boy Twin; she was severely malnourished and dehydrated, with so little subcutaneous fat that her skin was hanging on her bones.

Upon Girl Twin's admission, Father told Hospital personnel that he was unsure about her history because he was frequently out of town, but it was his understanding that Girl Twin usually ate four ounces of formula every two hours, along with a four ounce bottle of water every day. Girl Twin remained hospitalized for five days.

On August 21, 2007, the day Girl Twin was to be released from the hospital, Brice held a child and family team meeting with Mother and Father to discuss the safety and placement of the twins. In light of the babies' precarious condition and the instability of Mother's

---

[4]Normal body temperature for a premature baby is approximately 98 degrees Fahrenheit.

living arrangements, DCS informed the parents that they planned to place both twins in foster care.[5]

On August 23, 2007, DCS filed a petition in the Juvenile Court of Madison County, asking the court to find that the twins were dependent and neglected and to enter an order placing them in State protective custody. The next day, the juvenile court entered an order granting DCS's request. In the order, the juvenile court noted that both babies had been hospitalized for malnutrition and dehydration, that the family's utilities had been cut off and Mother had been living with a family friend, that the family did not participate in home health services, and that the parents had no reliable means of transportation. The next month, a guardian ad litem was appointed.

On October 24, 2007, the juvenile court conducted a hearing in the matter. Mother and her appointed counsel were present at the hearing. Father did not participate in this proceeding, but his appointed counsel was present to represent his interests.[6] On November 20, 2007, the juvenile court entered an order noting that Mother had stipulated that the twins were dependent and neglected, and finding dependency and neglect as to Father by default. A permanency plan was entered, and both Mother and Father were granted supervised visitation. The juvenile court scheduled a hearing for November 27, 2007, on the issue of whether the children had been subjected to "severe child abuse."[7]

As scheduled, on November 27, and continuing on December 18, 2007, the juvenile court held a hearing on the sole issue of whether the twin babies had been severely abused.[8] *See* T.C.A. § 37-1-102(b)(23) (Supp. 2009). The appellate record does not include a transcript of those proceedings. The record indicates, however, that DCS called four witnesses to testify. The witnesses included Lisa Piercey, M.D. ("Dr. Piercey"), who was called in as a consultant as to Boy Twin when he was hospitalized for emergency treatment, and who treated Girl Twin when she was hospitalized a few days later. The twins' medical records were also submitted into evidence. The juvenile court apparently took the case under advisement.

---

[5]DCS explored the possibility of placing the children with a family member, but they could find no suitable family member willing to take custody of the premature infants.

[6]Father did not participate in any of the ensuing court proceedings related to the twins.

[7]In Tennessee, the juvenile court that adjudicates a child to be dependent and neglected must also determine whether the parent committed severe child abuse. *See* Tenn. R. Juv. P. 28(f)(1)(iii).

[8]Because Father had not participated in any of the proceedings as of the date of the hearing, Father's counsel was relieved of his duty to represent Father.

On January 29, 2008, the juvenile court entered an order finding that both twins suffered from abuse and neglect perpetrated by both Mother and Father. The juvenile court concluded, however, that only Boy Twin had suffered severe child abuse.[9]

The juvenile court subsequently ordered Mother to undergo a Center for Children and Parents psychological evaluation ("CCP evaluation") at LeBonheur Children's Hospital.[10] In the CCP evaluation, Mother indicated that she came from a broken home; her mother neglected her and her father was in and out of jail for selling and using marijuana. After Mother reached adulthood, she entered into a relationship with Father. Their relationship was abusive, and Father frequently used marijuana. Mother's oldest child is from a prior relationship, and the father of that child is not present in the child's life.

The results of Mother's CCP psychological testing revealed that she has Low Average to Borderline Intellectual Functioning. Although she is a high school graduate, Mother's reading comprehension is only at a third grade level. Her verbal IQ was estimated at 75, which is in the 5th percentile, and her performance IQ was estimated at 80, in the 9th percentile. The evaluation did not find a formal thought disorder or psychosis. The evaluator commented that Mother tried to project an image of being well-adjusted and capable out of concern that showing any weakness might disqualify her from regaining custody of the babies. He speculated that this fear of appearing incapable might be the reason why Mother did not accept the government services that were offered to her. The evaluation indicated that Mother at times does not fully grasp or appreciate what is being explained to her, but is reluctant to admit this. The evaluator determined that Mother had "some insight" as to the special needs Boy Twin would have as a result of his severe neglect, because she recognized that Boy Twin would need a variety of professional appointments throughout his childhood.

On November 26, 2008, the babies' guardian ad litem filed a petition in the juvenile court to terminate the parental rights of both Mother and Father based on severe child abuse, abandonment, failure to comply with the provisions of the DCS permanency plans, and

_____

[9]The juvenile court initially held the finding of severe abuse in abeyance pending a review hearing, because it did not want to issue a ruling that would result in different visitation rights as to Boy Twin and Girl Twin. The review hearing was held on May 13, 2008. On May 20, 2008, the juvenile court entered an order ratifying the permanency plan, and reaffirming the finding of severe abuse as to Boy Twin.

[10]The CCP was initially tasked with performing a broad family evaluation to assist DCS in determining whether Mother could give the twins a safe, nurturing environment that was free from abuse and neglect. Mother's evaluation was to be a part of this broader family evaluation.

persistent conditions.[11] The proceedings related to the termination of Mother's parental rights are not the subject of this appeal. Importantly, however, the juvenile court indicated that the issue of severe child abuse in the underlying dependency and neglect proceedings had to be resolved by a final order before the termination petition could proceed.[12]

Ultimately, after several hearings, on August 11, 2009, the juvenile court entered a final order finding that Boy Twin was the victim of severe child abuse, but that Girl Twin was not a victim of severe child abuse.[13] Mother filed a notice of appeal with the Circuit Court of Madison County, seeking a *de novo* review of the juvenile court's conclusion that she had inflicted severe child abuse on Boy Twin.[14] *See* T.C.A. § 37-1-159 (2005). Father did not appeal the juvenile court's ruling.[15]

On December 3, 2009, the circuit court below conducted a *de novo* hearing on Mother's appeal from the juvenile court's dependency and neglect findings. Mother again stipulated that both children were dependent and neglected, but challenged the finding of severe child abuse. Mother, DCS, and the GAL all stipulated that the circuit court should consider the issue of severe child abuse as it related to both Boy Twin and Girl Twin.

At the circuit court hearing, Dr. Piercey testified again as an expert in pediatric medicine and child maltreatment. She indicated that, in her experience, the Hospital's NIC Unit employees did a thorough job in educating parents of premature babies on feeding and other care,

---

[11]Mother asserts in her appellate brief that the petition for termination was inadvertently filed under the dependency and neglect docket number.

[12]As discussed *infra*, a finding of "severe child abuse" in the underlying dependency and neglect proceedings is relevant to the termination of parental rights for at least two reasons. First, "severe child abuse" is an independent ground for the termination of parental rights. *See* T.C.A. § 36-1-113(g)(4) (Supp. 2009); *DCS v. David H.*, 247 S.W.3d 651, 655 (Tenn. Ct. App. 2006). Second, if a parent has engaged in severe child abuse, DCS is not obligated to use reasonable efforts to preserve and reunify the family. *See* T.C.A. § 37-1-166(g)(4)(A) (2005).

[13]In that order, the juvenile court set the petition for termination of parental rights for hearing on September 1, 2009.

[14]Mother's notice of appeal was actually filed prematurely on August 10, 2007. A prematurely filed notice of appeal is deemed to have been timely filed. *See In re Spencer P.*, No. M2009-00019-COA-R3-JV, 2010 WL 2160694, at *4 (Tenn. Ct. App. May 27, 2010) (finding it appropriate to apply Rule 4(d) of the Tennessee Rules of Appellate Procedure and the general appellate principle that the right to appeal is not lost by filing a premature notice of appeal).

[15]Father was incarcerated when the juvenile court entered its ruling. The reason for his incarceration is not clear in the record, though some reports indicate that it was drug- related.

commenting, "Primarily the only thing the parent is going to be doing when they get the baby home is feeding the infant." She said she had found that the NIC Unit was strict in its discharge procedures, that it did not discharge premature babies until it was fully established that the child was feeding well, and that the parent was appropriately responding to the infant. Dr. Piercey explained the importance of feeding premature children baby formula, mixed in the correct proportions and on schedule, because the appropriate nutrition was crucial to the early stage development of their brains and other important organs. Dr. Piercey testified that the NIC Unit has regimented feedings for the babies, typically between two and four ounces every two to three hours. A premature baby should never be fed water, she explained, because it would dilute the nutrition that the child would otherwise get from the formula and could cause other problems. Dr. Piercey said that the NIC Unit teaches parents the warning signs of problems and gives them information about infant CPR and other safety measures. This information is conveyed to parents verbally, in writing, and through video presentations.

Dr. Piercey stated that, when Boy Twin and Girl Twin were admitted to the hospital in August 2007, they were each so severely undernourished that they had no fat under the skin, even on their buttocks, thighs, and abdomen, just "skin over bones," like "curtains hanging." She commented, "you could just kind of pick it [the skin] up and fold it over." She testified that Boy Twin was "pretty much dead" when emergency personnel arrived at Mother's home. Dr. Piercey said that his body temperature was 86 degrees Fahrenheit and added, "I don't know how he survived." Boy Twin's blood glucose level was three, the normal level being 80. Dr. Piercey noted that Boy Twin had lost weight since his discharge from the hospital in July, dropping from being in the fifteenth percentile for weight to below the third percentile. She described this as a "very shocking" drop in weight that "would require pretty much very limited feedings at all." As to Girl Twin, Dr. Piercey stated that "she was sicker than she looked" when she was brought to the hospital. Although Girl Twin's condition was not as life-threatening as Boy Twin's, Dr. Piercey said, she was similarly severely undernourished, and would have been in the same condition as Boy Twin had she continued on the same course at home for another 48 to 72 hours.

In her testimony before the trial court, Dr. Piercey was questioned about the long-term effects of the malnutrition and dehydration suffered by the twin babies. When asked whether Boy Twin's malnutrition/failure to thrive would "have a negative aspect on the child's mental status or development," Dr. Piercey responded:

> Sure. . . . That nutritional component, particularly glucose, in fact [is] essential for that rapid brain growth and development that happens in the first few months of life. Particularly in that timeframe [sic] where they're supposed to still be in the womb.

So when that doesn't happen, then you worry about long-term disability, long-term mental retardation, maybe even cerebral palsy later on because they don't get the nutrients that they needed during that very critical time. Once you lose it, you can't get it back.

Dr. Piercey was later asked whether, in her expert opinion, both of the twins had suffered any type of abuse that would likely cause great bodily harm or death. As to Boy Twin, she replied that there was "no question" but that he suffered that type of abuse. She indicated that Girl Twin "did undergo severe bodily harm because of her dehydration, her lack of nutrients for her brain growth." On a scale of 1 to 10, 1 being healthy and 10 being death, she opined that Boy Twin was a 10 at the time he was admitted to the Hospital, and that Girl Twin was between a 7 and 9. Dr. Piercey added that Girl Twin would also have been a 10 in another 48 hours, had she not been hospitalized when she was.

Dr. Piercey was asked whether, to a degree of medical certainty, she believed that the abuse or neglect of the twins "would reasonably cause to produce a severe psychosis or severe developmental delay, or severe neurotic disorder, or severe depression?" She replied, "yes" to severe developmental delay, but "no" as to psychosis and neurosis. She explained that there is a "spectrum" of developmental delay, and that profound developmental delays occur when the children "have significant problems meeting their milestones." She added that problems with developmental delay might not become apparent until the children are placed in a formalized academic setting, when they exhibit "attention span problems, behavior problems, [or] learning disabilities."

Dr. Piercey stressed the importance and convenience of home health services for families of new infants, noting that the services are provided in the parents' home.[16] Had home health services been utilized for the twin babies in this case, Dr. Piercey said, the babies would have been weighed every day and observed while feeding to detect problems right away. Dr. Piercey observed that, had Mother used home health care services and brought the babies to their pediatrician for the required follow-up visits, their malnutrition issues likely could have been prevented.

DCS presented the testimony of Drema Blake ("Blake"), the Hospital social worker assigned to Mother's case. After the twin babies were born, Blake arranged the home health visits for Mother upon the twins' release. Blake met with Mother, explained to her the home health care services and procedures, and had Mother sign a document consenting to the receipt of

---

[16]Dr. Piercey commented: "I think home health is a privilege and I don't know why anybody wouldn't comply with that . . . . [I]t's extremely critical for the doctor to have that information [from the home health professionals]."

home health services. Blake was certain that Mother was aware that home health services had been scheduled for her. Blake said that the services would have been provided at no cost to Mother, as they were covered by TennCare. When Mother changed her residence, Blake said, the onus was on Mother to contact the home health agency to let them know. From all of her dealings with Mother, Blake said, Mother had a clear understanding that the home health services were needed for her babies and that the services were ordered by the babies' physician.

CPS investigator Brice also testified at trial. Brice worked on the twins' case for approximately one week, from August 14 to August 21, 2007. During that time, Brice said, DCS had three addresses for Mother. She first tried to visit Mother and Girl Twin at the grandmother's Steam Mill Ferry Road address. The grandmother told Brice that Mother and her children had moved, and that she did not know Mother's new address. Brice then obtained Mother's cell phone number from Mother's brother, so she left Mother a cell phone message. When Mother finally returned Brice's telephone call, Mother told Brice that she was living with Ms. Miller at the Park Place Apartments. Mother acknowledged to Brice that she knew that home health services had been scheduled for her babies, and that she did not contact anyone to provide her new address.

Brice then testified about her visit with Mother and Girl Twin at Ms. Miller's apartment. Mother acknowledged to Brice that she did not take the babies to their follow-up appointment with their pediatrician, and said that she failed to do so because she did not have transportation. Concerned about Girl Twin's malnourished appearance, Brice took a photo of Girl Twin to show to her supervisor, along with her findings from her visit. When Brice became aware of the circumstances surrounding Boy Twin also, she included Boy Twin in her case.

Brice testified that she had been a CPS investigator for six years and had worked on over 200 cases. With that background, she judged the degree of severity of Girl Twin's condition when she took on the case to be 10 on a 10–point scale, compared with children she had seen in the past.[17]

DCS called Jacqueline Cannon ("Nurse Cannon"), a registered nurse in the NIC Unit at the Hospital, to testify about the Hospital's protocol for training parents how to feed and care for their premature babies. Nurse Cannon said that, as much as possible, the Unit tries to get the parents to feed their premature babies, so that they receive "hands-on" training. She

---

[17]By the time Brice became aware of Boy Twin, he had been in the hospital receiving treatment for approximately a week. Nevertheless, even at that point, Brice still judged the severity of his condition as between "5 or 6" on a 10-point scale.

explained that such "hands-on" training is very important because if the parents are proficient in the feeding techniques, the babies can be released home sooner. Nurse Cannon said that most parents "room in" the night before the baby is expected to go home, to make sure that the parents have practiced feeding them and to give the parents the opportunity to ask for assistance. She said that when the babies are discharged from the hospital, the discharge nurse reviews with the parents the discharge instructions, including the proper temperature for the child, umbilical cord issues, and warning signs indicating that a doctor should be called. In addition, the parents are asked to watch a CPR video and are given a discharge sheet with written instructions on feeding and caring for the premature baby. Nurse Cannon obtained Mother's signature on Boy Twin's discharge papers.

Helen York ("York"), a registered nurse in the NIC Unit, testified that she took care of the twins the first two days after they were born. She said all of the Hospital personnel caring for the babies on the different shifts observed that Mother appeared to favor Girl Twin, and they had to encourage her to give attention to Boy Twin. York stated that the twin babies were fed about every three hours. She corroborated Nurse Cannon's testimony that the Hospital personnel try to teach the parents of premature infants how to care for their infant from the moment the baby is admitted to the NIC Unit.

Mother testified on her own behalf. She recalled receiving instructions and training given at the Hospital on how to feed and care for her premature babies and on recognizing the warning signs that something was wrong. Mother acknowledged that she signed discharge papers that included instructions on caring for her babies, and that she stated in writing that she understood the discharge instructions. She was asked, "Did you, at that time, understand what the discharge instructions were?" Mother replied, "Yes, ma'am." Mother also said that, before the twins were discharged from the hospital, she received an explanation about home health visits and signed a document agreeing to such visits. Mother said that, at the time, she did not realize the importance of the home health visits. Mother testified that when she brought the twin babies home from the hospital in July 2007, they were overall feeding pretty well, but she claimed that Boy Twin still appeared to have some feeding issues.

Mother testified that the home health care workers visited her once while she and the children were still living at her grandmother's house. The next day, Mother said, when she took the twins for their two-week checkup with their pediatrician, they were fine. She admitted that, when she moved out of her grandmother's house, she did not inform DCS of her new location, and she offered no explanation for failing to do so.

Mother acknowledged that she was the person responsible for feeding and caring for her twin babies. She claimed that she fed the twins every two hours, even more than the every-three-hour schedule recommended by the Hospital. Mother said that she used the powder-style

formula, she mixed it according to the instructions, and she did not water it down. Mother, however, was working six hours a day, and while she was working, she left the children in the care of either Father or Ms. Miller. She testified that she instructed them on how to feed the twin infants properly, and neither of them ever reported to her that they had trouble feeding the twins.

On cross-examination, Mother admitted that the August 9, 2007 emergency 911 phone call about Boy Twin was placed at 4:00 p.m. and that, at that point, she had last fed Boy Twin six hours earlier at 10:00 a.m. In light of this, Mother conceded that she may have been mistaken in her earlier testimony about the frequency with which she fed the twins.

Mother claimed that in the days before he was taken to the Hospital in August 2007, Boy Twin was "doing fine." She did not notice the symptoms of severe malnutrition and dehydration described by Dr. Piercey. Specifically, before the babies were taken to the Hospital in August 2007, she did not notice that the babies had lost weight or anything else that would have led her to believe that they were not healthy. Mother specifically denied that she knowingly allowed the babies to become malnourished, and she at no point thought that her treatment would cause them harm. Mother said she was at fault for the dire condition of the twin babies in August 2007, only because she trusted others to help care for the twins.

Mother testified that she had been treated for depression in the past, but said that she was not taking any medication for this condition at the time of trial. Mother claimed that even though she did not have transportation, she was in a position to take custody of the children because she had stable housing and employment.

Mother's testimony concluded the proceedings before the circuit court. The circuit court took the matter under advisement to consider the testimony, the technical record, and the trial exhibits, including Mother's CCP evaluation and psychological testing.

On December 29, 2009, the circuit court entered an order finding by "overwhelming clear and convincing evidence" that both Girl Twin and Boy Twin were victims of severe child abuse as defined in T.C.A. § 37-1-102(b)(23), subparts (A) and (B).[18] The circuit court held

_____

[18]That statute provides:

> (23) "Severe child abuse" means:
>
> > (A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great

(continued...)

that Mother engaged in "severe child abuse" as described in subpart (A), because she knowingly exposed the premature twin babies to abuse or neglect that was likely to cause great bodily harm or death, or failed to protect them from such abuse or neglect, and she was at least in a "state of awareness" that her actions or her failure to act could lead to tragic results. In addition, the circuit court held that Mother perpetrated "severe child abuse" as defined in subpart (B) of the statute based on Dr. Piercey's testimony about the developmental problems the children will encounter as they grow older. Thus, the circuit court held that both twins were victims of "severe child abuse," and that Mother was the perpetrator. From this order, Mother now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother stipulates that both of her twin babies were dependent and neglected. She argues that the circuit court erred in concluding that clear and convincing evidence established that both twins were subjected to "severe child abuse."[19] Specifically, she argues that, to support a finding of severe child abuse, the evidence must show clearly and convincingly that her acts or failure to act were "knowing." Mother contends that the evidence is insufficient to show that her conduct was "knowing" in light of her limited intellect and psychological profile, as reflected in her CCP evaluation and other evidence. Even assuming that she possesses the necessary intellect to appreciate the risks involved in her negligent conduct, Mother claims that the evidence did not clearly and convincingly show that she deliberately ignored the situation. She claims that her failure to update her address with the home health agency or to take her children to their check-ups with the pediatrician does not rise to the level of severe abuse.

---

[18](...continued)

> bodily harm or death;
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct . . . .

T.C.A. § 37-1-102(b)(23).

[19]The juvenile court proceedings are part of the appellate record. However, pursuant to Section 37-1-159, Mother was given a *de novo* dependency and neglect hearing before the circuit court. Therefore, her appeal is from the circuit court's findings and order.

In response, DCS maintains that the evidence before the circuit court showed clearly and convincingly that Mother's abuse or neglect of the twins was "knowing." In addition, DCS claims that the definition of severe child abuse in subsection (B) of Section 37-1-102(b)(23) does not require that the parent's conduct be "knowing;" rather, it is sufficient to show that the abuse or neglect of the child "will reasonably be expected to produce" the severe consequences to the child noted in that subsection. Therefore, DCS asserts, the circuit court correctly held that both twins were subjected to severe child abuse pursuant to both subsection (A) and subsection (B) of Section 37-1-102(b)(23).

Severe child abuse in a dependency and neglect proceeding must be proven by clear and convincing evidence. **See Cornelius v. DCS**, 314 S.W.3d 902, 905-06 (Tenn. Ct. App. 2009). In previous cases, we have explained the clear and convincing standard as applied in this type of proceeding:

> For evidence to meet the clear and convincing standard, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. **In re Valentine**, 79 S.W.3d 539, 546 (Tenn. 2002) (citing **Hodges v. S.C. Toof & Co.**, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. **In re M.L.P.**, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). Clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. **In re M.A.R.**, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting **In re C.W.W.**, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

**In re Isaiah L.**, No. M2009-02455-COA-R3-JV, 2010 WL 4342208, at *11 (Tenn. Ct. App. Oct. 19, 2010), *perm. appeal denied* (Tenn. Feb. 16, 2011).

Under this standard of proof, the appellate court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." **In re Tiffany B.**, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). The facts as found by the trial court are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. **Cornelius**, 314 S.W.3d at 906-07. Findings of fact based on witness credibility are given great deference and will not be disturbed absent clear evidence to the contrary. **Id.** Whether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that the parent committed severe child abuse is a question of law, subject to *de novo* review with no presumption of correctness. **Id.**

**ANALYSIS**

A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons, it is not absolute. *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

Our legislature has established the situations in which the rights of a biological parent may be limited. These limitations include circumstances in which a child is deemed to be dependent and neglected. "Parents have a duty to provide, and children have a corresponding right to be provided with a safe environment, free from abuse and neglect." *In re R.C.P.*, M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6 (Tenn. Ct. App. July 13, 2004) (citations omitted). The primary purpose of dependency and neglect proceedings "is to provide for the care and protection of children whose parents are unable or unwilling to care for them." *DCS v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *9 n.11 (Tenn. Ct. App. Mar. 8, 2005).

> Children who are found to be dependent and neglected are frequently removed from their parents'[] custody and placed in the custody of [DCS]. If the parents' conduct that precipitated the dependent and neglect proceeding is sufficiently serious, a finding of dependency and neglect may be the foundation for a proceeding to terminate the parents' parental rights.

*In re Gaven R.*, No. M2005-01868-COA-R3-CV, 2007 WL 2198288, at *7 (Tenn. Ct. App. July 23, 2007).

In this case, Mother stipulated that her babies were dependent and neglected, and the issue on appeal is whether the circuit court erred in making a further finding that they were subjected to "severe child abuse" within the meaning of Section 37-1-102(b)(23). A finding of severe child abuse has serious ramifications:

> A finding of severe abuse triggers other statutory provisions, including a prohibition on returning the child to the home of any person who engaged in or knowingly permitted the abuse absent consideration of various reports and

recommendations. Tenn. Code Ann. § 37-1-130(c). Even with such consideration,

> No child who has been found to be a victim of severe child abuse shall be returned to such custody at any time unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse.

Tenn. Code Ann. § 37-1-130(d). Further, Tenn. Code Ann. § 37-1-130(g)(4)(A) provides that reasonable efforts to reunify a family are not required to be made if a court has determined that a parent has subjected the child or a sibling to severe child support.

> The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. Tenn. Code Ann. § 37-1-130(g)(4) ("the parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court.") The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*M.S.*, 2005 WL 549141, at \*10. Thus, if there is a finding of severe child abuse, under the statutes, DCS is relieved of the obligation to use reasonable efforts to reunify the child with the parent, it is more difficult for the parent to regain custody, and one ground for termination of the parent's parental rights is effectively established.

Mother argues that the trial court erred in finding severe child abuse, because the evidence does not show that her neglect of her premature infants was "knowing," as required under the statutory definition. DCS argues that the provision of the statutory definition of "severe child abuse" at issue does not require DCS to prove that Mother's neglect was "knowing." We consider first whether "knowing" conduct or neglect is an element of the applicable provision of the statutory definition of severe child abuse. We then address whether clear and convincing evidence establishes that Mother's neglect in this case was "knowing."

### "Knowing" as Element

The circuit court found that both of the twin infants were subjected to "severe child abuse" as defined in subpart (A) and subpart (B) of Section 37-1-102(b)(23). DCS concedes that it is expressly required to prove that Mother's abuse or neglect was "knowing" under subpart (A). At issue, then, is whether the definition of "severe child abuse" in subpart (B) requires

-16-

a finding that the action, or failure to act, by the perpetrator was "knowing."[20]  Subpart (B) defines severe child abuse in pertinent part as:

> Specific . . . abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct. . . .

T.C.A. § 37-1-102(b)(23)(B).

Mother argues that, despite the omission of the term "knowing" from the first part of subsection (B), the element of knowledge is nevertheless required.  She notes that the last phrase in subsection B expressly refers to failure to protect that is "knowing," and argues that the use of the conjunctive "and" to join the first and second parts of the subsection, rather than the disjunctive "or," indicates that DCS is required to show that the conduct of *both* the perpetrator and a parent who was not the perpetrator was "knowing."  She points out that "[e]very other subpart of the statute requires knowing conduct."  Mother claims that the historical context of the statute indicates that it was intended to apply only to intentional conduct, because the statute was enacted after a highly publicized incident of intentional child abuse.  Mother argues forcefully that the statute should not be read as "outcome determinative" because it "was not intended to cover neglectful conduct that happens to cause severe injury."  She reasons that the statute should not be read so as to include as severe child abuse a single neglectful incident, such as one incident of failing to secure a young child in a car seat, if it ends up resulting in severe harm to the child.  Thus, Mother insists, under both subparts (A) and (B) of Section 37-1-102(b)(23), DCS should be required to prove that the parent had knowledge of the potentially disastrous consequences when the neglect was perpetrated.

In response, DCS argues that the word "and" in Section 37-1-102(b)(23)(B) "may be read to mean either 'and' or 'or,' in other words, either conjunctively or disjunctively."  It contends that the plain language of this subsection of the statute "requires a knowing state of mind only from the enabler of abuse likely to cause severe developmental delays [and] contains no knowing requirement for the actual perpetrator of such abuse."  DCS emphasizes that the legislature can, and has, held a parent responsible for abuse even if the parent does not have the ability to act willfully, as with a parent who has a mental disability.  ***See State***

---

[20] At oral argument, this Court requested that the parties file supplemental briefs on this important issue. Both parties filed timely supplemental briefs, and we consider the arguments raised therein in our analysis.

***v. Smith***, 785 S.W.2d 336, 338-39 (Tenn. 1990). It maintains that subsection (B) is intended to apply to those who perpetrate abuse or neglect sufficient to cause severe developmental or psychological delays, whether knowing or not.

With the parties' arguments in mind, we address the interpretation of "severe child abuse" in subsection (B) of Section 37-1-102(b)(23). In interpreting this statute, we must "carry out legislative intent without broadening or restricting the statute beyond its intended scope." ***Estate of French v. Stratford House***, No. E2008-00539-SC-R11-CV, 2011 WL 238819, at *5 (Tenn. 2011). The statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says. ***See BellSouth Telecomms., Inc. v. Greer***, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997). If the language of a statute is clear, we must apply the plain meaning of the statute without complicating the task. ***Estate of French***, 2011 WL 238819, at *5. The statute should not be interpreted to render any part of it meaningless or superfluous. ***See Roy v. City of Harriman***, 279 S.W.3d 296, 302 (Tenn. Ct. App. 2008).

The parties have not cited, nor have we found, any Tennessee case construing the definition of "severe child abuse" contained in subsection (B) of the statute. Thus, the issue presented is one of first impression. To reiterate, subsection (B) provides that "severe child abuse" occurs when, "in the opinion of qualified experts [the abuse or neglect] has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment . . . ." T.C.A. § 37-1-102(b)(23)(B). This subsection also defines severe child abuse as "the *knowing* failure to protect a child from such conduct." ***Id.*** (emphasis added). Conspicuously absent from the first portion of this subsection is the term "knowing." The omission of "knowing" in the first part of subsection (B), applicable to the perpetrator of the abuse or neglect, could be construed to suggest that the child will be considered the victim of "severe child abuse" if the statutory requirements are met, regardless of the extent of the perpetrator's knowledge. Moreover, reading the statute naturally, the word "knowing" in the last part of the subsection appears to refer to an enabler of the abuse or neglect, not to the perpetrator.

In past cases, when presented with an issue of first impression, we have on occasion looked to decisions of other states applying similar statutory provisions. ***See, e.g., Parrish v. Marquis***, 172 S.W.3d 526, 530 (Tenn. 2005). Our research of child protection statutes in other states revealed no other state that uses a statutory definition of "severe child abuse" similar to the definition in Subsection (B) of Section 37-1-102(b)(23). We did, however, find some commonality in the overall approach used across the country in child protection statutes. Although Mother argues that an interpretation of subsection (B) as "outcome determinative" would be an anomaly, our research indicates that having a component of the

child protection statutes that focuses on the *effect* of the parent's conduct on the child, rather than focusing on the parent's intent or knowledge, is not unusual.

In ***New Jersey Division of Youth & Family Services v. A.R.G.***, the New Jersey intermediate appellate court considered the circumstances under which state child protection statutes relieved state authorities of the obligation to provide reasonable efforts to reunify the parent and child. ***N.J. Div. of Youth & Family Servs. v. A.R.G. (In re C.R.G.)***, 824 A.2d 213 (N.J. Super. Ct. App. Div. 2003), *aff'd in pertinent part*, 845 A.2d 106, 286 (N.J. 2004). In a "scholarly" opinion, the intermediate appellate court looked at the history of the Federal Adoption and Safe Families Act of 1997 (ASFA)[21] and its interplay with child protection statutes.[22] In doing so, the New Jersey intermediate appellate court reviewed child protection statutes in numerous states, including Tennessee. *Id.* at 228-29. Looking at the "common threads[] or themes" in the various state approaches, the court observed:

> We conclude that the term "aggravated circumstances" [excusing the requirement to use reasonable efforts] embodies the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child and would place the child in a position of an unreasonable risk to be reabused.
>
> Moreover, any circumstances that increase the severity of the abuse or neglect, or *add to its injurious consequences*, equates to "aggravated circumstances." Whether couched as "severe child abuse or neglect," "serious child abuse or neglect," or "severe physical injury" of a *singular,* chronic, recurrent, or repetitive nature, *where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety and welfare of the child*, they are "aggravated" to the extent that the child welfare agency . . . may bypass reasonable efforts of reunification.

*Id.* at 233 (emphasis added).

---

[21] The intermediate appellate court in *A.R.G.* observed that AFSA "represented a substantial shift in the intent and purpose of the child protection system" and "subordinates parental rights to the paramount concern for the health and safety of the child when making a decision on whether or not it is in the child's best interests to preserve the family unit." *A.R.G.*, 824 A.2d at 232-33 (citations omitted).

[22] We note that the definition of "severe child abuse" at issue in this appeal was adopted by Tennessee's legislature in 1977. In 1998, in apparent response to Congress' enactment of ASFA, Tennessee enacted legislation stating that the State need not utilize "reasonable efforts" to reunify the family where there were "aggravating circumstances." *See* T.C.A. § 37-1-166(g)(4)(A). "Aggravating circumstances" is defined as, *inter alia*, "severe child abuse." T.C.A. § 37-1-166(9).

In the Tennessee statute, the definition of severe child abuse in subsection (B) explicitly focuses on the "injurious consequences" of the perpetrator's "specific" neglect, even going so far as to expressly require "the opinion of qualified experts" on those expected consequences.[23] In that sense, subsection (B) is structured differently and has a different emphasis than subsection (A), which focuses explicitly on whether the perpetrator or the enabler had knowledge that the abuse or neglect was "likely to cause great bodily harm or death." We are obliged to read both statutory subsections *in pari materia*, so as to respect what each subsection is intended to address, and in a way that does not make subsection (B) redundant or superfluous.

From our review, subsection (B) appears intended to address precisely the circumstance in this case, namely, child victims who are especially fragile and vulnerable and less able to survive the risk inherent in reunification. The failure to properly nourish a fourteen-year-old child for a two-week period, while abusive, would not have the catastrophic consequences of the failure to nourish a premature infant who is only days old. Subsection (B) appears intended to be broad enough to include a perpetrator's conduct toward an especially vulnerable child victim that, regardless of the perpetrator's knowledge or intent, creates "an unacceptably high risk to the health, safety and welfare of the child." *A.R.G.*, 824 A.2d at 233.

From our reading of subsection (B), we find it to be "plain and unambiguous as written." *Estate of French*, 2011 WL 238819, at *5. Reading Section 37-1-102(b)(23) as a whole, it appears that the omission of the term "knowing" in the first part of subsection (B) was intentional, not merely inadvertent or the result of inartful drafting. The omission, then, means that specific knowledge is not required for a finding of severe child abuse by the perpetrator under this subsection. This conclusion is consistent with the statutory scheme as a whole. Thus, we conclude that, under subsection (B) of Section 37-1-102(b)(23), the trial

---

[23]Notably, general "abuse" (which is not "severe") does not necessarily involve any "knowing" conduct. "Abuse" is defined in Section 37-1-102(b)(1) in terms of the consequences suffered by the child, not in terms of the parent's intent:

> (1) "Abuse" exists when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker . . . .

T.C.A. § 37-1-102(b)(1). We have observed that this definition is "broad enough to include inappropriate handling of a child without intent to injure." *In re Gaven R.*, No. M2005-01868-COA-R3-CV, 2007 WL 2198288, at *8 n.11 (Tenn. Ct. App. July 23, 2007) (citing Section 37-1-102(b)(1)).

court was not required to find that Mother's neglect was "knowing" in order to find that her twin infants were the victims of "severe child abuse."[24]

## Proof of Knowing Neglect

Mother also argues on appeal that there is not clear and convincing proof in the record that her neglect of the twin babies was knowing. The circuit court found severe child abuse under subsections (A) and (B) of T.C.A. § 37-1-102(b)(23). As noted above, "knowing" neglect is expressly required under subsection (A), so we consider Mother's argument and the proof in this cause.[25]

Mother argues that the circuit court erred in failing to consider the evidence on her intellect, specifically, the CCP test results that showed a verbal IQ of 75, in the 5th percentile, and a performance IQ of 80, in the 9th percentile, and an overall classification as Borderline Intellectual Functioning. Mother also notes the observations in the CCP evaluation that Mother often does not fully grasp what people are telling her, but is reluctant to say so because she wants to project the image of an intelligent, capable person who does not need assistance. As corroboration, Mother's counsel cites instances during Mother's trial testimony in which the questioner based questions on mistaken assumptions and Mother simply answered the questions without correcting the erroneous assumption.

Mother's counsel also argues that, even if she is found to have the intellectual ability to understand the directions given her on the care of her premature babies, Mother's testimony showed that she simply did not appreciate the risk to her children. Specifically, she did not recognize the importance of staying in contact with the home health care agency and taking the babies to follow-up appointments with the pediatrician, and did not realize the risks involved in failing to feed the infants every two hours. Mother's counsel points to the fact that she retained custody of her older children, who were not born prematurely. Mother's counsel also notes that the DCS worker who visited Mother's home took a photograph of Girl Twin and did not remove her from the home; she argues from this that Girl Twin's serious condition must not have been so obvious if the DCS worker did not remove the child immediately.

---

[24] Our holding is limited to dependency and neglect proceedings. We express no opinion on the interpretation of Section 37-1-102(b)(23)(B) as applied in a proceeding to terminate parental rights.

[25] Our analysis of the proof as to Mother's knowledge is also applicable in the alternative on subsection (B), assuming *arguendo* that proof of "knowing" neglect by the perpetrator were required under that subsection as well.

The term "knowing" as used in Section 37-1-102(b)(23) is not defined by statute. "The words 'knowing' and 'knowingly' do not have fixed or uniform meanings," and "[t]heir meanings in particular cases vary depending on the context in which they are used or the character of the conduct at issue." *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004). In the context of the dependency and neglect statutes, the term has been described as follows:

> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly" when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5 (Tenn. Ct. App. July 14, 2010) (citing *In re R.C.P.*, 2004 WL 1567122, at *7); *see also In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009).

In this case, the circuit court found that Mother acted "knowingly" in neglecting both twins. This finding was based in part on the circuit court judge's assessment of Mother during her testimony, and his determination as to the credibility of her testimony. Insofar as the circuit court's finding was based on its credibility determinations, we, of course, accord those determinations great deference on appeal. *See Cornelius*, 314 S.W.3d at 906-07.

According appropriate deference to the circuit court's implicit determinations on the witnesses' credibility, we find ample evidence in the record to support the circuit court's finding that Mother's neglect was "knowing." The testimony at trial showed that the Hospital's NIC Unit personnel took great care in educating Mother about the needs of her premature infants and how to care for them. Mother acknowledged that she was trained at the hospital as to the proper care and feeding of the twins. She also conceded that a discharge nurse presented her with a form indicating that she was given proper instructions, and that she understood those instructions. Mother received one home health care visit before she moved from her grandmother's house, and also had one visit with the babies' pediatrician. Certainly Mother received plenty of instruction and training on caring for the infants. Most importantly, Mother acknowledged in her testimony that she understood the instructions, and even testified that she in fact fed the babies every two hours. The circuit court considered the CCP evaluation and Mother's in-court testimony and was entitled to credit Mother's testimony that she understood the instructions she received.

Of course, Mother's assertion, that both of her premature babies were in fact fed in accordance with the instructions she had been given, was patently untrue. After a favorable checkup with the pediatrician on July 27, 2007, less than two weeks later, on August 9, 2007,

Boy Twin was rushed to the Hospital "pretty much dead." The records and the undisputed testimony describe an infant whose appearance was shocking, with no fat whatsoever under his skin, skin hanging over his bones, and in respiratory distress. Clearly, Boy Twin had been consistently starved during the interval between July 27 and August 9. By the time Girl Twin was rushed to the Hospital, the evidence shows that she was in a similar state, with essentially no subcutaneous fat and skin hanging on her bones. The fact that Mother would assert falsely in her testimony that both babies had been fed appropriately and that Boy Twin looked like he was "doing fine" until he went into respiratory distress is also indicative of her "state of awareness." Moreover, after Boy Twin was hospitalized, Mother must have been aware of his dire condition, and nevertheless apparently continued to starve Girl Twin until she too was hospitalized. We find clear and convincing evidence in the record to support the circuit court's conclusion that Mother's neglect was "knowing."

We find also that Dr. Piercey's testimony satisfies that statutory requirement under subsection (B) of Section 37-1-102(b)(23) of an opinion from a qualified expert that Mother's neglect "has caused or will reasonably be expected to produce . . . severe developmental delay." Thus, we find that the elements of severe child abuse under subsections (A) and (B) of Section 37-1-102(b)(23) were proven by clear and convincing evidence, and so affirm the circuit court's ruling that both twins were subjected to severe child abuse.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Tikindra G., for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE