IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 3, 2025

# IN RE AVERY H.

**Appeal from the Juvenile Court for Madison County**
No. 59-53-702      Christy R. Little, Judge

_____

## No. W2024-01763-COA-R3-PT

_____

This appeal involves the termination of a mother's parental rights to her special needs child. The trial court found by clear and convincing evidence that several grounds for termination were proven and that termination is in the best interest of the child. We reverse one ground for termination but otherwise affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part, Affirmed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN, JJ., joined.

Alexander David Camp, Jackson, Tennessee, for the appellant, Kierria H.

Lanis L. Karnes, Jackson, Tennessee, Guardian ad Litem.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

This case involves heartbreaking child abuse. The child at issue, Avery, was born to Kierria ("Mother") and her husband ("Father") in March 2018. Avery was their first child. He was born premature at 29 weeks gestation and weighed only four pounds at birth. Avery was discharged from the neonatal intensive care unit to go home with his parents on May 30, 2018.

Just two weeks later, in June 2018, Father transported Avery to the hospital emergency department in Jackson, Tennessee. According to Mother, she and Father

became concerned because Avery was breathing but would not take a bottle and had become unresponsive. Doctors determined that Avery was suffering from hypothermia, subarachnoid hemorrhage, and subdural hematoma (brain bleed). Avery was transported by helicopter to LeBonheur Children's Hospital in Memphis. While Avery was at LeBonheur, a skeletal survey revealed fractures to his sixth, seventh, and eighth ribs, as well as a left distal femur fracture, left proximal tibia fracture, and a left distal radius fracture. The radius fracture appeared to be a week or so old, while the femur and tibia fractures appeared to be new. Avery's subdural hemorrhages were also found to be "multiple and in various stages of resolution." Ophthalmology was also consulted and diagnosed Avery with bilateral retinal hemorrhages. These injuries were deemed "suspicious for more than one episode of nonaccidental trauma." Mother and Father denied any knowledge as to how Avery sustained his injuries.

After spending about a week at LeBonheur, Avery was deemed stable for discharge. The hospital's Child Advocacy Resource and Evaluation Services team was consulted and arranged for a safe disposition with Mother's aunt ("Aunt"). Avery was discharged into her care on June 21, 2018, with various medications and a discharge plan to follow up with numerous consultations in the days and weeks ahead, including follow up appointments with orthopedic surgery, ophthalmology, neurology, neurosurgery, and the Child Advocacy Resource and Evaluation Services clinic. That same day, an investigator from Child Protective Services and the Department of Children's Services filed an affidavit in support of a protective custody order in the juvenile court of Madison County, describing Avery's extensive injuries and alleging that there was probable cause to believe he was dependent and neglected and in need of immediate protection based on the exigent circumstances. The juvenile court entered a protective custody order the same day, finding probable cause to believe that Avery was dependent and neglected. The order found that it was contrary to Avery's welfare to remain in the home of his parents and brought him into the protective jurisdiction of the court, awarding temporary legal custody to Aunt.

Avery has been in Aunt's care ever since. A dependency and neglect and severe abuse proceeding was commenced but was continued numerous times due to efforts to obtain voluminous medical records from Avery's treatment providers and due to the possibility that criminal charges might be brought against his parents. The court also addressed issues regarding domestic violence between the parents. The parents had some supervised visitation with Avery. Mother gave birth to another child in March 2019.

An adjudicatory and dispositional hearing was finally held in November 2020. Over the objection of Avery's guardian ad litem, the juvenile court accepted a stipulation of dependency and neglect in lieu of seeking a finding of severe abuse. Thus, the order stated that the parties stipulated that Avery was dependent and neglected, that there was no less drastic alternative to removal, and that it was contrary to his best interest to remain in his parents' custody. The order included factual findings that DCS received a report of alleged physical abuse when Avery was three months old and was transported from the hospital in

Jackson to LeBonheur with hypothermia, subdural hematoma, and subarachnoid hemorrhage. It stated that LeBonheur determined Avery also suffered from fractures to his ribs, femur, tibia, and radius, and he had bilateral retinal hemorrhages, with these injuries being suspicious for more than one episode of nonaccidental trauma. The order stated, "The Court finds that the child is a victim of severe abuse but does not find the child was a victim of severe abuse perpetrated by the parents as the perpetrator cannot be identified." It stated that temporary custody would remain with Aunt and her husband pending further orders of the court. However, the order also stated that "this case shall be closed" and that DCS was relieved from further responsibility in the matter. The order stated that Avery's guardian ad litem would "remain appointed to this matter."[1]

One month later, on December 3, 2020, Avery's guardian ad litem filed a petition to terminate the parental rights of Mother and Father. By that time, Avery was two and a half years old. The petition alleged the following grounds for termination of parental rights: persistent conditions, severe abuse, and failure to manifest an ability and willingness to assume custody. It also asserted that termination was in the best interest of Avery. Counsel was appointed for Mother and for Father; however, neither filed an answer to the termination petition.

The termination trial began on September 7, 2021. Avery was three years old by then. Mother had given birth to a third child just three months before trial, and she and Father brought their two-year-old child to court with them due to an issue with childcare. The child was allowed to play in the court's "Safe Haven room" while the trial proceeded. The trial court heard testimony from Mother and the Executive Director of CASA for Madison County. Mother described the events that occurred on the date of Avery's visit to the emergency department. She testified that she and her female cousin went to pay bills together earlier that day and that Avery "was fine." Mother testified that Father returned from work late that evening and tried to feed Avery a bottle while she took a shower, but he would not take it. She testified that Avery "wasn't moving at all" and became unresponsive, although he was still breathing. Mother testified that she then directed Father to take Avery to the hospital, and she stayed home to pray over the phone with her pastor. She said that no one had been babysitting Avery and that she and Father were the only ones to care for him that day and the day before. Mother testified that she had taken Avery to three doctor appointments earlier that week, for a check of his heart, a well-child visit, and because he was spitting up, and "he was perfectly fine" so she never knew that he was suffering from these injuries. Mother denied that she or Father abused Avery.

Mother testified that she and Father talked with DCS at the hospital and agreed that Avery would be placed in the custody of her aunt until further court orders. She recalled attending permanency plan meetings with DCS and being asked to attend Avery's doctor

---

[1] There was some delay with the entry of the written order from this hearing, and it was not entered until March 2021.

appointments and twice-weekly therapy sessions, in order to gain an understanding of his medical needs. She testified that she and Father "made some efforts to go" but had a baby to care for and admittedly arrived late for the few appointments they did attend due to Father's work schedule. Mother stated that they had attended "two or three" medical appointments and "a few" therapy sessions. She testified as to various excuses for her failure to attend the appointments, including that she was not informed of the dates, work schedules, etc. Mother testified that Father had been in jail recently for driving without a license and failure to appear. She admitted that he had questioned his paternity of Avery for a period of time because, Mother said, "I told him out of anger when me and him was upset with each other." She admitted to having domestic violence issues with Father but claimed that it had only occurred once, before Avery was born.

When asked what she had done to bond with Avery over the past three years, Mother said she would "check up on him" and had attempted to plan events for his birthdays, although conflicts with Aunt's schedule prevented them from occurring the past two years. She said that she last saw Avery in April 2021, five months before trial, before she gave birth to her third child. Mother's wages had been garnished for child support when she was working a regular job. However, she was not currently working aside from delivering for Doordash and Instacart, and her ability to do that was limited due to having an infant. The family was receiving food stamps and lived in public housing. They had one vehicle, and Mother drove Father to his job and picked him up each day. Mother testified that she and Father were fully capable of raising Avery. She testified that there was nothing stopping her from regaining custody, nothing wrong with her parenting of her other two children, and she was not aware of any potential risk to Avery if he was returned to her. However, when asked how Avery's speech was developing, Mother admitted she did not know. She did not know how Avery was progressing intellectually either.

The trial court also heard testimony from Hannah Snowden, the Executive Director of Madison County CASA. She oversaw CASA volunteers, including the volunteer assigned to Avery's case, who happened to be a former nurse and took great interest in Avery's medical needs and care. Ms. Snowden communicated with the volunteers weekly and knew what was happening in each of their cases, and she identified numerous CASA reports that had been created regarding Avery since his birth. She testified that Avery went home from LeBonheur with Aunt, and Aunt had taken very good care of him from the beginning. She explained that Aunt fully met all of Avery's medical needs, taking him to all of his doctor appointments and physical therapy sessions. The CASA reports noted Avery's multitude of specialists and medical appointments and stated that Aunt was dedicated to getting him to all of them, even though it was "a big job" and very time consuming. The reports indicated that Aunt was doing "a remarkable job juggling Avery's appointments and needs." She was described as "so diligent and conscientious in her care of Avery." Ms. Snowden testified that CASA had concerns "throughout the life of the case" about the fact that "there were not consistent visits between Avery and his parents," and child support was not being consistently paid. She said CASA also had concerns about

- 4 -

safety in the parents' home.

According to the reports identified by Ms. Snowden, Avery's CASA volunteer reported that her greatest concerns were related to the questions still surrounding what happened to Avery and how he sustained his significant injuries. She noted, "No one seems to have adequately answered that question." The volunteer stated in her report that Avery had overcome a lot in his short life and that "[n]o one knows why he has had to suffer." By the time Avery reached a year old, the CASA reports stated that it was "heartening to see" how much progress he had made living with Aunt, he had "finally reached a very stable place medically," where he was eating well and gaining weight, he had formed a strong attachment to Aunt, and it was "troubling to think" about removing him from the only home and stability he had known. The report noted that Avery's parents never took him to his "continual medical appointments" or provided care for him thereafter. Another CASA report stated that Mother and Father's visits were intermittent, they did not appear to be making the effort needed to adequately form an attachment, and, in the volunteer's opinion, they should be required to begin attending appointments to learn to care for him. Avery's volunteer reported that Aunt was driving many miles to appointments in Memphis and Nashville and knew his history "backward and forward because she has lived it," while Mother and Father knew very little about his care. Ms. Snowden testified that CASA was only on the case until it was closed by DCS, and the last CASA report that was reviewed was from August 2019. She closed by stating that Mother and Father had no meaningful relationship with Avery during the time CASA had the case.

At the conclusion of the first day of trial, which, again, was in September 2021, the case was continued to a second trial date in January 2022. However, the parties did not actually return for the next day of trial until over a year later, in March 2023. By that time, Avery was five years old. Mother had given birth to a fourth child. She brought her three youngest children (ages 4, 1, and 6 months) to court, stating that she could not find a babysitter. The trial judge emphasized that the case had already been reset due to issues involving an attorney being ill and an inability to get a court reporter, and she desired to proceed in the interest of achieving permanency for Avery. Mother and Father were sworn in as witnesses in order to testify. However, the transcript reflects that the children were crying, and Mother and Father insisted on another continuance so that they could participate without the children present. The guardian ad litem objected, but the trial judge reset the termination trial for another date. However, Aunt was present and was permitted to give very brief testimony to provide a quick update on Avery's status. She testified that Avery was doing fine and was attending special education pre-K. She said he was receiving occupational therapy, speech therapy, and physical therapy. Aunt testified that Avery's speech was delayed and that he was only saying a few words. She testified that Avery also has a chromosomal disorder called Fragile X syndrome, which causes intellectual disability and causes him to be very hyperactive. She explained that Avery understands things he is told, such as if he is instructed to bring his cup or put on his shoes. However, she said he had not yet mastered potty training and just could not comprehend it yet. After her brief

- 5 -

update, the trial judge directed the parties to return two months later, in May 2023.

Unfortunately, the May 2023 trial date did not proceed as planned either. The final day of trial was not held until April 2024. In the meantime, Father and Mother had divorced, and he had voluntarily surrendered his parental rights to Avery. Father had obtained primary custody of the parties' three youngest children in the divorce, and an order of protection had been entered against Mother. According to the guardian ad litem, the three siblings living with Father were having visits with Avery. Avery was six years old by that time and in kindergarten. The trial court heard testimony from Mother and Aunt.

Regarding Avery's injuries, Mother still maintained, "I don't know what happened." However, she believed Avery would not be in jeopardy if placed in her care. She was not currently exercising parenting time with her other children due to the order of protection but planned to begin once it expired. She testified that she had been dealing with a criminal matter as well and "went to jail for a night" because Father called the police on her, but rather than explaining the situation, Mother testified that she was going to "stay silent." Mother testified that she was employed part-time at a hospital as a "housekeeper." She explained that she was only working part-time because she had "a lot of court dates" between her divorce proceeding, her criminal matter, and the termination case. She was still living in the same apartment in public housing. However, her rent was not current, and she had been in court for eviction proceedings the day before. She said the matter was dismissed because of an issue with the written notice, but Mother admitted that she had not paid rent for three months. She had been searching for another place to live but did not have any definite plan yet. Mother acknowledged that once she was served with the proper paperwork at her current apartment, she would only have ten days to move. If she could not secure housing with a landlord she had contacted, she planned to stay with church members.

Mother admitted that Avery had been financially supported by Aunt and her husband since he was three months old. She had paid some child support over the years and her wages were currently being garnished, but she still had an arrearage at the time of trial. She admitted that each time she had switched jobs there were periods of no support in between. When asked if she had taken any Christmas gifts or birthday gifts to Avery in the last year, Mother said no. She claimed that "a suggestion" had been made early in the termination proceeding that she "should hold off" on visiting Avery until the case was resolved because the outcome was uncertain and visiting might confuse him. However, Mother admitted that Aunt had reached out to her at Christmas in 2022 and said that she had gifts for Mother's three younger children and asked about getting the kids together to exchange gifts. Mother admittedly told Aunt "they could keep their gift" because of the animosity between them. Mother conceded that she had not reached out to Aunt in any manner in over two years, but she claimed this was due to the pending termination case. She later claimed that she may have reached out by text message the previous year but said

she did not have any proof. Mother acknowledged that she and Avery had not had any meaningful relationship since the termination case had been pending. Still, Mother testified that she wanted to maintain a bond with Avery and "maintain that relationship even if it is far . . . afar off."

Aunt testified as well. She testified regarding how Avery came into her care in 2018 at the time of his injuries. She acknowledged that she was a single parent to Avery at that time and received no financial benefit from the government to aid in his care. Aunt admitted that the guardian ad litem initially gave her "a hard time" because she did not have any medical training, and the guardian ad litem believed that Avery simply had too many issues for her to handle as a single person. Aunt described various appointments Avery had with different specialists, ranging from cardiology to neurology to eye doctors. She acknowledged that she had missed "a lot" of work taking Avery to appointments over the years.

Aunt testified that Avery had recently started receiving therapy at his school. He was still considered nonverbal and could say a few words but could not make a complete sentence. He was receiving speech therapy. When asked how much time she had spent learning how to care for Avery, Aunt testified, "[I]t's not a limit because we're still learning." She testified that she had been working regularly with doctors, nurses, and therapists at various facilities so that she would know what to do to work with him. Aunt testified that it is somewhat difficult for Avery to bond with others due to his disabilities. He participated in youth activities at their church to the best of his abilities. Aunt believed that if Avery could no longer be in their home, Avery would be impacted pretty badly, emotionally and physically, because he is accustomed to her and her husband and their routine there.

Aunt testified that Avery does not know Mother. She also conceded that her current relationship with Mother was not good. For instance, she testified that she would send pictures of Avery to Mother in the past and post pictures of him on Facebook for her to see, but Mother would send her a mean message criticizing her. Aunt testified that she did not know how to please Mother and that Mother had shown anger toward her through text messages and posting a video on Facebook. She was aware that Mother had recently gone to jail for "some kind of violence."

Aunt testified that she and her husband can financially support Avery without any future support from Mother. She testified that they desired to adopt him and give him permanency. Aunt said that she wanted the assurance of knowing that Avery was her child, she could make all decisions for his future, and he could take her last name. They were prepared to support and care for him beyond the age of eighteen due to his conditions. She testified that they love him and that he is very happy. Sadly, however, Avery was not yet able to "call [Aunt] anything" or refer to her by using any words.

At the conclusion of Aunt's testimony, the trial judge issued her oral ruling. She described this case as "one of the saddest I've ever seen." The trial court found that all three grounds for termination were proven by clear and convincing evidence and that termination of parental rights was in Avery's best interest. It subsequently entered a 33-page order detailing its findings of fact and conclusions of law. Mother timely filed a notice of appeal.

## II.    ISSUES PRESENTED

The issue presented for review by Mother is whether the trial court erred in finding that the guardian ad litem "met the burden of proving the termination of parental rights by clear and convincing evidence." The only argument she raises is regarding the best interest analysis. Regardless of whether the parties have raised the issue, however, we must also review the trial court's decision as to the grounds for termination. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

For the following reasons, we reverse one ground for termination but otherwise affirm the juvenile court's termination of Mother's parental rights[2] and remand for further proceedings.

## III.    STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

"In Tennessee, proceedings to terminate parental rights are governed by statute." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023) (citing *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015)). Tennessee Code Annotated section 36-1-113 "sets forth the grounds

---

[2] We note that in the guardian ad litem's brief on appeal, she raised a separate issue regarding whether this appeal must be dismissed "for failure to comply with T.C.A. 36-1-124(d)." Relying on a decision of this Court from 2017, she argued that the notice of appeal "was not personally signed by the Appellant as required under 36-1-124(d)," and therefore, this Court lacked subject matter jurisdiction over the appeal. The guardian ad litem also filed a separate motion to dismiss the appeal on the same basis, which we denied by order. The guardian ad litem asserted that "pursuant to T.C.A. § 36-1-124(d): 'Any notice of appeal filed in a termination of parental rights action shall be signed by the appellant.'" She argued that Mother's notice of appeal was filed on her behalf by her attorney but lacked Mother's signature. In *In re Bentley D.*, 537 S.W.3d 907, 915 (Tenn. 2017), the Tennessee Supreme Court held that "the signature requirement of Tennessee Code Annotated section 36-1-124(d) does not require a notice of appeal to be signed personally by the appellant," as the signature requirement is "satisfied when an attorney, with specific authorization from his or her client, signs the notice of appeal." The statutory language relied on by the guardian ad litem in this appeal was subsequently removed from section 124. *See* 2018 Pub. Acts, c. 875, § 35, eff. July 1, 2018 ("Tennessee Code Annotated, Section 36-1-124(d), is amended by deleting the subsection in its entirety."). A new subsection (d) was added to the statute effective July 1, 2024, but the guardian ad litem did not construct any argument regarding it. *See* 2024 Pub.Acts, c. 996, § 22, eff. July 1, 2024.

and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.* Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

### IV. DISCUSSION

#### A. Grounds for Termination

##### 1. Persistent Conditions

When the petition to terminate parental rights was filed in 2020,[3] the termination statute provided that this ground for termination existed when:

> (3)(A) The child has been removed from the home or the physical or legal

---

[3] Throughout this opinion, we apply the version of the statute in effect when the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

The threshold element for this ground to apply is met because Avery was removed from the home and the physical and legal custody of Mother "for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A). Avery was removed in 2018 by the protective custody order that found probable cause to believe he was dependent and neglected.

Regarding subsection (i), the trial court found that the conditions that led to removal included Avery's severe abuse and serious injuries. It found that those conditions still existed at the time of trial because Mother was unfit to care for Avery's serious physical, mental, and emotional needs. The trial court found that Mother had attended only two of Avery's "many medical appointments" and did not get the training offered to her regarding how to care for his special needs. The trial court also found that Mother did not have stable housing, failed to provide consistent support either financially or in kind, and failed to engage in consistent visitation with Avery. It also found that Mother had spent time in jail for domestic violence and had an order of protection against her regarding Father and her other children. Thus, like the trial court, we find clear and convincing evidence that "[t]he conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent," as well as "other conditions . . . that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

The trial court noted Mother's testimony that she planned to make changes in the future but found that "it is too late." It found that she "had every opportunity to participate

in [Avery's] life and she did not choose to do so." The court found that Mother failed to take responsibility for her actions and always claimed that "everything was someone else's fault." We agree and find by clear and convincing evidence that there is little likelihood that the aforementioned conditions "will be remedied at an early date so that the child can be safely returned to the parent [] in the near future." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Finally, we conclude that "[t]he continuation of the parent [] and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). As the trial court noted, Avery is in a safe and permanent home with Aunt and "has been waiting 6 years for permanency" while Mother attempted to get her life together. The trial court predicted that Mother would still be making the same promises ten years from now, "but the child does not have the time to wait." We affirm the trial court's finding that this ground was proven by clear and convincing evidence.

### 2. Severe Abuse

When the termination petition was filed in 2020, the statute provided that this ground for termination existed if:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4). Notably, this ground for termination provides two different "avenues for a finding of severe child abuse." *In re Anna B.*, No. M2016-00694-COA-R3-PT, 2017 WL 436510, at *4 (Tenn. Ct. App. Feb. 1, 2017). The severe abuse finding may have already been made in a "prior order of a court," or, in the alternative, the finding may be made "by the court hearing the petition to terminate parental rights or the petition for adoption." *See* Tenn. Code Ann. § 36-1-113(g)(4); *In re Anna B.*, 2017 WL 436510, at *4. Thus, "'[a]s the statute makes clear, the finding of severe abuse can be based on a prior court order or on evidence of 'severe child abuse' submitted to the court hearing the termination case.'" *In re Brianna T.*, No. E2017-01130-COA-R3-PT, 2017 WL 6550852, at *4 (Tenn. Ct. App. Dec. 22, 2017).

Here, the trial court's order purports to utilize both "avenues" described above. It states:

> The parents has [sic] been found to have committed severe child abuse, as defined in § 37-1-102, under prior order of this court and no appeal was filed. Severe abuse is confirmed by this court while hearing the petition to terminate parental rights. As described in the findings hereinabove, the parents have committed severe child abuse against the minor child.

- 11 -

We begin by examining the prior order of the juvenile court regarding severe abuse. "A finding of severe abuse in dependency and neglect proceedings has serious ramifications . . . since a finding of severe abuse can serve as a ground for termination of parental rights." *In re Kaliyah S.*, 455 S.W.3d at 537 n.5 (citing *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011)). In a termination of parental rights proceeding, the doctrine of res judicata prevents a parent from re-litigating whether he or she committed severe child abuse when such a finding has been made in a previous dependency and neglect action. *See In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016) (citing *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012)). Here, however, the order entered in the dependency and neglect proceeding stated, "The Court finds that the child is a victim of severe abuse but does not find the child was a victim of severe abuse perpetrated by the parents as the perpetrator cannot be identified." This ground for termination is established if "[t]he parent [] has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court . . . ." Tenn. Code Ann. § 36-1-113(g)(4). The dependency and neglect order in this case simply did not find that *Mother* committed severe child abuse.

We now turn to the alternative avenue for establishing this ground – where the parent "is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]" *See id.* The trial court's order stated, "Severe abuse is confirmed by this court while hearing the petition to terminate parental rights. As described in the findings hereinabove, the parents have committed severe child abuse against the minor child." Scattered throughout the 33-page order, the trial court made various findings regarding Avery's abuse. The trial court found that when Avery was discharged from the NICU, his medical records did not reflect any injuries upon release. The court found that Avery was healthy when he left the hospital. It found that Avery was readmitted to the hospital just two weeks later with all of the injuries described at length above. The court found that LeBonheur was of the opinion that Avery's exam findings were "suspicious for more than one episode of nonaccidental trauma, specifically abusive head trauma." It found that medical reports "showed that the injuries were in varying stages of healing." The court found that Mother gave "conflicting testimony" at trial regarding whether she was the one who took Avery to the hospital or stayed home to pray while Father took him. The trial court noted that Mother eventually admitted that she stayed home but "could not give a reason why she was not at the hospital with the father and child," as she could have simply asked her preacher to go to the hospital to pray with her there. The trial court found that Avery "suffered severe abuse while under [Mother's] care." It found that he "was born normal and [due] to no fault of his own, someone horribly abused him." The court found that "had [Mother] properly cared for him upon his release from the hospital, he would not have been minutes from death when he was rushed to the hospital." It found that "[t]he child was severely abused after being sent home from the hospital after birth, [and Mother] fails to acknowledge her role in this." The trial court found that Mother "is in denial about the severe abuse." Notably absent from

these findings, however, is any finding that Mother either knowingly exposed Avery to abuse, knowingly failed to protect him from abuse, or knowingly used force on him.

Pertinent to this appeal, the following definition of severe child abuse was in effect at the time when the termination petition was filed in 2020:

> (27) "Severe child abuse" means:
> (A)(i) The *knowing* exposure of a child to or the *knowing* failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the *knowing* use of force on a child that is likely to cause serious bodily injury or death[.]

Tenn. Code Ann. § 37-1-102(b)(27) (emphasis added). The Tennessee Supreme Court recently provided a helpful discussion of the "knowing" requirement and different forms of severe child abuse in this version of the statute, in the context of a case with facts quite similar to those before us in *In re Markus E.*, 671 S.W.3d 437, 460-72 (Tenn. 2023). There, the infant at issue was born premature at only three pounds, was discharged from the NICU to his parents, and was later found to have suffered over twenty rib fractures. *Id.* at 444. We quote from the Court's discussion at length:

### A. "Knowing" Conduct

> The state of mind associated with severe child abuse as defined in section 37-1-102(b)(22)(A)(i) is "knowing." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). The statutes do not define "knowing." . . . .
> Viewing the severe child abuse provision in context, we note that other grounds for termination of parental rights have historically required a showing of a different state of mind, for example, that the parent's act or failure to act was "willful." *See, e.g.*, Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2016) (requiring a showing that the parent "willfully" failed to visit or "willfully" failed to support the child). The Court interpreted willfulness to require a showing that the parent had the ability to visit or support, and implied a certain amount of intentionality. *See, e.g.*, *In re Adoption of A.M.H.*, 215 S.W.3d [793, 810 (Tenn. 2007)] (holding that the evidence on the parents' failure to visit did not "support a finding that the parents intentionally abandoned" the child); *see also Willful*, *Black's Law Dictionary* (11th ed. 2019) ("Voluntary and intentional, but not necessarily malicious"). In contrast, the term "knowing" does not require proof the parent *intended* for the child to suffer abuse or neglect, but instead focuses on the parent's awareness of relevant facts. *See, e.g.*, *Knowing*, *Black's Law Dictionary* (11th ed. 2019) ("Having or showing awareness or understanding; well-informed").
> If the term "knowing" indicates awareness, the question is, awareness

- 13 -

of what? Our answer to that question must be consonant with the words that surround "knowing" in the statute. . . .

Here, the statute uses "knowing" as part of the phrase "knowing failure to protect a child from abuse or neglect." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). While it surely includes actual awareness of abuse or neglect that has occurred, the phrase "knowing failure to protect a child from abuse or neglect" is not limited to that. The term "protect" means to "defend or *guard against* injury or danger" and to "*keep safe.*" *Protect*, *Shorter Oxford English Dictionary* (6th ed. 2007) (Oxford University Press) (emphasis added). Thus, "protect" includes not only defending but also guarding against danger, *i.e.*, *risk of future injury.* The phrase "failure to protect" is forward-looking; in family law, it means the "refusal or inability of a parent or guardian to *prevent* abuse of a child under his or her care." *Failure (failure to protect)*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added). Thus, the term "knowing" as used in "knowing failure to protect a child from abuse or neglect" must include not only awareness of abuse or neglect that has occurred, but also awareness of facts, circumstances, or information indicating that the child is at risk or in danger of suffering abuse or neglect.

In the context of parental termination cases, our Court of Appeals has discussed how the term "knowing" should be interpreted:

> . . . .
>
> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re S.J.*, 387 S.W.3d [576, 592 (Tenn. Ct. App. 2012)] (quoting *In re Samaria S.*, 347 S.W.3d at 206) (emphasis and internal citations omitted). "Persons act 'knowingly' when they have specific reason to know the relevant facts and circumstances but deliberately ignore them." *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004); *see also In re H.L.F.*, 297 S.W.3d 223, 237 (Tenn. Ct. App. 2009) ("By deliberately and recklessly ignoring Father's pedophilic interests, Mother knowingly failed to protect Heather from being raped by Father....").

This interpretation of "knowing" traces back to *In re R.C.P.*, 2004 WL 1567122 at *7, in which then-Judge Koch adopted a definition articulated by the West Virginia Supreme Court in *West Va. Dep't. of Health & Hum. Res. ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996). The West Virginia court explained that the statutory term "knowingly" as used in the

West Virginia definition of child abuse "does not require that a parent actually be present at the time the abuse occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse occurred." *Id.* at 878-79. Thus, the evidence is generally required to show the parent was presented with facts, circumstances, or information that would alert a reasonable parent to take affirmative action to protect the child. *See id. See also R.S. v. Dep't of Child.*, 831 So. 2d 1275, 1278 (Fla. Dist. Ct. App. 2002) ("In order for the father to have failed to protect, there must have been evidence that he had the capability to prevent the abuse. This by necessity requires proof that he knew or should have known of the mother's conduct and resulting injury to" the child); *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App. 2019) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards.").

Applying Tennessee's severe child abuse statute, our intermediate appellate court has found "knowing" failure to protect even absent proof that the parent was actually aware that abuse or neglect had occurred. Under this standard, the requisite awareness is of facts, circumstances, or information that would have triggered a reasonable parent's duty to take affirmative action to protect the child from abuse or neglect. If the parent has been presented with such facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered knowing. *See, e.g.*, *In re Samaria S.*, 347 S.W.3d at 206-07 (proof supported finding that intellectually-challenged mother had enough ability to recognize the importance of facts presented to her and appreciate the risk of abuse or neglect to her children, and thus supported finding that her neglect was knowing); *In re Aleksandree M.M.*, No. M2010-01084-COA-R3-PT, 2010 WL 3749423, at *3 (Tenn. Ct. App. Sept. 27, 2010) (while there was no evidence the mother saw the boyfriend's sexual abuse of daughter, proof showed mother ignored risk implicit in incidents such as her boyfriend's lewd comments about young girls in mother's presence, and his request for permission to "court" mother's daughter); *In re Estrella A.*, No. M2022-00163-COA-R3-PT, 2022 WL 17091958, at *7 (Tenn. Ct. App. Nov. 21, 2022) (mother had been abused by her own father, knew his propensity toward sexual abuse, was warned to prohibit contact between maternal grandfather and her children, and yet still lived with children in sister's home with grandfather and exposed children to risk of abuse).

Similarly, a parent's failure to protect can be considered knowing if the parent was deliberately ignorant, as where the parent avoids actual knowledge of the abuse or neglect but is aware of facts, circumstances, or information that would put a reasonable parent on notice of the risk and the need to protect the child. *See, e.g.*, *In re Tamera W.*, 515 S.W.3d 860, 875 (Tenn. Ct. App. 2016) (father would often leave the home when mother

- 15 -

began beating children); *In re S.J.*, 387 S.W.3d at 593 (mother ignored admonition by healthcare provider that infant was underweight and needed to be examined by a physician, did not take the child to be seen by a physician, and continued to starve the child); *In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *6 (Tenn. Ct. App. July 14, 2010) (when mother noticed child's injuries after leaving him in care of her boyfriend, she chose to believe her boyfriend's explanation that child fell while they were playing).

. . . .

Accordingly, we agree with the Court of Appeals and hold that, in the context of severe child abuse, a person's conduct is considered "knowing," and a person is deemed to "knowingly" act or fail to act, when "he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her." *In re S.J.*, 387 S.W.3d at 592 (citing *In re R.C.P.*, 2004 WL 1567122, at *7). Under this standard, the relevant facts, circumstances, or information would alert a reasonable parent to take affirmative action to protect the child. For deliberate ignorance, persons can be found to have acted knowingly "when they have specific reason to know" the relevant facts, circumstances, or information "but deliberately ignore them." *In re R.C.P.*, 2004 WL 1567122, at *7. For reckless disregard, if the parent has been presented with the relevant facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered "knowing."

### B. Severe Child Abuse by Commission or Omission

"Severe abuse" encompasses two different forms of severe child abuse, both equally culpable. One involves commission and the other involves omission. The commission form is defined as "exposure of a child" to "abuse or neglect that is likely to cause serious injury or death," or the "use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). The omission form is defined as "failure to protect a child" from such abuse, neglect, or use of force. *Id.* Severe child abuse can be either or both.

Sometimes when a child suffers abuse while in the custody of both parents, the evidence shows that one parent inflicted the abuse and the other parent failed to protect the child from it. For example, in *In re H.L.F.*, 297 S.W.3d at 236-37, the father subjected all of the children to various forms of active abuse; he engaged in sexual abuse with some of the children while the others witnessed it. In that case, there was no evidence that the mother participated in the abuse or actually saw it. *Id.* Still, she was well aware of the father's prurient sexual interest in minors, and the father's sexual abuse

- 16 -

of his daughter was known by the three other children in the home as well as other children who visited the home. *Id.* Under those circumstances, the appellate court called it "inconceivable" that the mother would not "recognize that abuse ... had occurred or that it was highly probable that severe child abuse would occur." *Id.* at 237. Thus, the appellate court concluded that the mother had engaged in the "omission" form of severe abuse by knowingly failing to protect her children from the father's abuse. *Id.*

Even so, when a child is in the custody of both parents, the structure of the statute does not necessarily require the trial court to determine which parent "expos[ed]" the child to "abuse or neglect that is likely to cause serious bodily injury or death" or "use[d] force on a child that is likely to cause serious bodily injury or death," or whether both parents did. Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016). The definition of "severe abuse" is in the disjunctive; a parent may be found to have committed severe abuse if the proof shows the parent *either* knowingly inflicted the abuse *or* knowingly failed to protect from the abuse. *Id.*

The reason for this statutory structure is apparent; abuse is often perpetrated on children too young to say which parent inflicted it, and often both parents deny any abuse occurred. Our Court of Appeals described this common scenario:

> This case presents a textbook example of the confluence of circumstances that are presented with unfortunate regularity in cases of alleged child abuse. A preverbal infant or child sustains serious injuries, the only witnesses to the injuries are the parents or caregivers who maintain that the injuries result from an innocent misunderstanding or inexplicable mystery, and testimony by medical personnel whose role is to opine as to the most likely cause of the child's injuries, not to identify the perpetrator.

*In re S.J.*, 387 S.W.3d at 591. Thus, it may not be possible to determine which parent inflicted the abuse, or if both parents did. In such cases, both parents may be found to have committed severe abuse if the proof shows that at least one of them must have knowingly inflicted the abuse and the other must have knowingly failed to protect from the abuse.

For example, in *In re E.Z.*, [E2018-00930-COA-R3-JV, 2019 WL 1380110, at *16 (Tenn. Ct. App. Mar. 26, 2019)], while the child was in the custody of both parents, he suffered "not one but a series of injuries," including three broken bones, a bruised penis, and a torn frenulum. The undisputed medical evidence showed the injuries "were non-accidental in origin." *Id.* Both parents denied any abuse. The trial court found: "[B]oth

parents know which of them harmed this child. The parent who harmed the child knows that he or she caused the injuries. The other parent knows that he or she did not, and that it must have been the other parent." *Id.* Despite this, the trial court declined to find either parent committed severe abuse. It explained that even though the injuries occurred while in the parents' care, the trial court could not, "due to each parent's claimed ignorance of how [the child] received any of his injuries, find one or the other responsible." *Id.* at *17.

The intermediate appellate court rejected this reasoning:

> Mother's and Father's denials, by themselves, are not dispositive of anything. [The child's] injuries fit within the definition of serious bodily harm necessary to sustain a finding of severe child abuse.... We need not identify which parent physically applied the violent force necessary to inflict the injuries on [the child] because, in view of the medical evidence, other facts as found by the Trial Court, and the Trial Court's credibility determinations, there were sufficient facts presented to Mother and Father from which, at a minimum, each could have and should have recognized that severe child abuse had occurred or that it was highly probable to occur and that the other parent was the abuser.

*Id.* at *18. The intermediate appellate court held that the evidence clearly and convincingly showed that "Father or Mother subjected [the child] to severe child abuse with the other's knowledge." *Id.* at *19. Thus, while the statute requires an individualized finding that each parent committed severe child abuse, the trial court is not always required to figure out which parent did what.

The catch in this situation is that the proof must show—as to both parents—that even if they didn't actually inflict the injuries to the child, they must have *knowingly* failed to protect the child. In other words, the proof must show both parents had "actual knowledge of" the relevant facts, circumstances or information or were "either in deliberate ignorance of or in reckless disregard of" relevant facts, circumstances, or "information that ha[d] been presented to him or her." *In re S.J.*, 387 S.W.3d at 592 (quoting *In re Samaria S.*, 347 S.W.3d at 206). *See, e.g.*, *In re H.L.F.*, 297 S.W.3d at 237 (referring to facts showing that severe abuse had occurred "or that it was highly probable that severe child abuse would occur."). The petitioner needs to show, as to both parents, that they were aware of facts, circumstances, or information that would alert a reasonable parent to take affirmative action to protect the child. Thus, even if it cannot be determined which was the "perpetrator" parent, both can be held responsible for having knowingly

- 18 -

failed to protect the child.

That is the situation here. The trial court found there was no medical cause for Markus's rib fractures and they were non-accidental in nature. It found that the rib fractures must have been inflicted by either Mother or Father. These findings were affirmed by the Court of Appeals. However, neither the trial court nor the Court of Appeals made an individualized finding on which parent, or that both, actually inflicted the child's injuries. There is no evidence in the record that would permit such a determination.

It is clear that Mother and Father both failed to protect Markus from injury. However, to affirm a finding of severe child abuse as to both parents, the evidence in the record must show that the failure to protect was "knowing" as to both. We focus, then, on the proof in the record as to both parents: what did they know and when did they know it?

Father and Mother stress there is no *direct* evidence they knew of the fractures to Markus's ribs and failed to protect him, only circumstantial evidence. That the evidence in this case is circumstantial is of no moment. As our Court of Appeals has observed:

> In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver.

*In re S.J.*, 387 S.W.3d at 592. We have rejected any suggestion that circumstantial evidence is inferior to or less probative than direct evidence. *See State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011) (citing 2A Charles Alan Wright & Peter J. Henning, *Federal Practice & Procedure* § 411 (2009)); *cf.* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.03(a) (2022) ("Do not assume that direct evidence is always better than circumstantial evidence. According to our laws, direct evidence is not necessarily better than circumstantial evidence. Either type of evidence can prove a fact if it is convincing enough."). Circumstantial or not, evidence is evidence, and we consider it all.

Here, the trial court emphatically rejected the testimony from Mother and Father about hearing a "crackling sound" near Markus's ribs. The trial court characterized the parents' testimony as "a cover story," an "attempted cover up" in which both parents were "complicit." On appeal, we defer to the trial court's credibility determination about the parents' testimony on this issue. *Jones v. Garrett*, 92 S.W.3d [835, 838 (Tenn. 2002)]. It can be

reasonably inferred that the trial court found that the parents' testimony about the "crackling sound" was knowingly false and offered with intent to deceive.

Still, the inference from this testimony can only take us so far. The parents' lack of credibility is relevant but not sufficient. It tells us that the parents were untruthful about what they knew before the TriStar x-rays revealed a rib fracture. But it does not tell us what the parents actually knew or when they knew it. *Cf. Dep't of Child.'s Servs. v. H.A.C.*, No. M2008-01741-COA-R3-JV, 2009 WL 837709, at *4 (Tenn. Ct. App. Mar. 26, 2009) ("But, other than the dubious explanations she gave regarding the possible causes of the child's injuries, there is no evidence in the record to support a finding that Mother knowing exposed her child to abuse ...."); *In re N.B.-A*, 657 Pa. 137, 224 A.3d 661, 672 (2020) ("[S]uspicions are not a substitute for clear and convincing evidence.... [A]lthough we are troubled by Mother's initial false statements ... those statements in and of themselves are insufficient to establish, under a clear and convincing evidence standard, that, prior to the time she made those statements, Mother knew or should have known of a danger posed to Child ....") (internal quotation marks and citation omitted). We look further, then, at the "relevant facts and circumstances" known to Mother and Father. *See In re R.C.P.*, 2004 WL 1567122 at *7.

The record shows that Markus had many physical challenges other than the rib fractures. He was born premature and had several conditions related to his premature birth, including an inguinal hernia, an inherited overactive thyroid condition, and a related blood condition, thrombocytopenia. Markus had skull abnormalities and subdural hematomas. He had frequent breathing, congestion, and feeding issues. After Markus was admitted to Vanderbilt, physicians there diagnosed him with a viral infection, an abnormality of the cartilage around his larynx called laryngomalacia, and enlarged adenoids that obstructed his airway.

Sometimes, evidence of multiple unexplained injuries to a child can point to abuse by the custodial parents. *See, e.g.*, *In re S.J.*, 387 S.W.3d at 594 (agreeing with the trial court's decision not to credit the mother's "assertion that her children's numerous injuries were simply the result of 'a ridiculously bad stream of luck.'"); *In re N.T.B.*, 205 S.W.3d at 507 (finding knowing failure to protect where "[t]he Child's injuries, which occurred while the Child was very young, were multiple, very serious, inflicted on separate occasions with great force, and not self-inflicted or accidentally inflicted."); *In re E.Z.*, 2019 WL 1380110, at *17 (after child suffered three broken bones, a bruised penis, and a torn frenulum, the appellate court observed that "[t]he bottom line is Mother and Father could or would do nothing to prevent these injuries that kept cropping up.").

That is not the case here. The trial court did not find, nor does the evidence indicate, that Markus's other physical issues were non-accidental,

inflicted injuries. In saying that, we pause at Markus's subdural hematomas. Although the pediatric plastic surgeon who discovered the subdural hematomas did not suspect abuse, child abuse specialist Dr. Brown did. She testified that such hematomas can be "highly associated with abusive trauma" and were "concerning for somebody hurting him and hurting his brain." However, after considering them closely, she said she could not testify that Markus's hematomas were caused by abuse. Thus, in this record, no evidence shows that any of Markus's physical conditions other than the rib fractures can be attributed to abuse.

Against this backdrop, we consider what Mother and Father would have observed about Markus's rib fractures before the first was spotted on the TriStar x-ray on January 10, 2015. Dr. Brown described in her testimony how a child with rib fractures would appear to caregivers. "In the beginning when a fracture is caused," she said, "they're going to be fussy and in pain." Because rib fractures are not necessarily accompanied by external bruising or other identifiable body damage, the source of the pain, even from an acute or recent injury, may not be obvious:

> A. You're not going to necessarily know what they're fussy from. So it—with rib fractures, it is fairly common for parents who—or for people, caretakers who don't know that they have fractures to—that's not going to be their natural assumption. So there would have been a time when he was probably fussier than usual but it may have been hard for a caretaker—they wouldn't jump to the conclusion that he had rib fractures, I guess, is what I'm trying to say.
> Q. Would you expect there to be any particular symptomology when he was picked up or grabbed around his torso area, for instance, if he had fractured ribs?
> A. There can be, and—but some kids with rib fractures are, you know, if they're generally calmer babies anyway, you know, you can determine, oh, gosh, I'm picking him up this way, this is a little bit weird that he's crying. But a lot of babies, you just aren't going to be able to tell the difference between fussiness from another cause and fussiness from a rib fracture.
> . . . .

Dr. Brown's testimony indicates that a caregiver of Markus who did not inflict the injuries would have noticed, at most, fussiness, crying, and perhaps some difficulty breathing.

One would expect reasonable parents to notice persistent fussiness, crying, and breathing difficulties, and to seek medical attention. In this record, Mother and Father did both. Even crediting the trial court's finding that Mother's testimony was not credible, it is undisputed in the record that

Mother took Markus to see several healthcare providers during the relevant period, and that Father relied on Mother to do so.

In September 2014, Markus was seen by a pediatric plastic surgeon, who took a scan of his skull to diagnose the cause of the child's skull abnormalities. In December 2014, Mother took Markus to see a nurse practitioner and reported heavy, labored breathing, congestion, irritability, and feeding issues. A week later, Mother brought Markus to a follow-up appointment with his pediatric endocrinologist for his thyroid condition. Early on Christmas Day 2014, Mother took Markus to the Vanderbilt Hospital emergency room for coughing and congestion. Finally, on January 10, 2015, Mother took Markus to TriStar, reporting continued coughing. TriStar x-rayed Markus's chest only to determine if he had bronchitis. Instead, it revealed a rib fracture.

All of these medical providers examined and treated Markus. Until the TriStar x-ray, none recognized or suspected rib fractures or injury. None of Markus's medical records document visible signs of injury. In addition, Grandmother and Daycare Provider both cared for Markus during the relevant period. Both testified they never saw or heard anything to cause them to suspect Markus was injured or in pain.

With benefit of hindsight, we can see that at least some of Markus's fussiness, congestion, breathing difficulties, and feeding issues were likely caused by his rib fractures. Hindsight, however, is not the proper lens. We look at what the non-perpetrating parent knew or must have known before discovery of the abuse by authorities. In the specific circumstances in this case, even Dr. Brown acknowledged that Markus's other physical conditions, such as laryngomalacia, could have obfuscated the signs of rib fracture detailed in her expert testimony.

In cases where our appellate courts have upheld a finding of knowing failure to protect from severe abuse, there was proof that the non-perpetrating parent was presented at the time with facts, circumstances, or information showing that the child had been, or was likely to be, subjected to abuse or neglect. *See, e.g.*, *In re E.Z.*, 2019 WL 1380110, at *17 ("[B]ased on the medical evidence presented at trial, we do not believe Mother could have missed B.G.'s reaction to being hurt so badly."); *In re Samaria S.*, 347 S.W.3d at 207 ("The records and the undisputed testimony describe an infant whose appearance was shocking, with no fat whatsoever under his skin, skin hanging over his bones, and in respiratory distress."); *In re R.C.P.*, 2004 WL 1567122, at *8 ("[T]he record contains evidence that proves clearly and convincingly that M.A.F. deliberately and recklessly disregarded the information she had regarding B.J.'s prurient interest in sex that made it likely that he would sexually abuse R.C.P.").

Absent such proof, a finding of "knowing" failure to protect will not stand. Courts in sister states with a comparable "knowing" state-of-mind

requirement have held that the state-of-mind element was not proven where an infant's injuries were not perceptible and there was no history of harmful conduct by the other parent. For example, in *In re Adner G.*, 925 A.2d 951 (R.I. 2007), the Supreme Court of Rhode Island found clear error in a trial court's determination that the parents either abused their infant child or knowingly let that abuse happen. The Rhode Island Court based its holding in part on testimony indicating that the infant's older injuries were neither visible nor detectable, and in fact were not discovered by "any of the doctors who examined the infant during the first seven weeks of her life." *Id.* at 960.

In a Michigan case involving a child who died from blunt force trauma to the head, the appellate court held that a mother's parental rights as to her surviving children could not be terminated for severe abuse or failure to protect. *In re Brown/White*, No. 359038, 2022 WL 2188473, at *1 (Mich. Ct. App. June 16, 2022). The child was in the care of both parents and the evidence indicated the injury was inflicted by one of them. *Id.* at *3. However, no external injuries were visible and, even though the child suffered severe internal injuries, there was nothing in the record showing that the non-abuser parent could have detected them. *Id.* at *4. Thus, even though the evidence allowed for an inference that either the mother or father inflicted the abuse, the finding of severe abuse as to the appellant mother was reversed because there was "nothing to suggest that the non-abuser parent was aware of the need to protect the child from the abuser." *Id.*

In a Florida case, *R.S. v. Dep't of Child. & Fams.*, the evidence showed that the mother inflicted severe abuse on the child, and the question on appeal centered on the father's failure to protect. 831 So.2d at 1278. Florida's intermediate appellate court reversed the trial court's termination of the father's parental rights where competent medical evidence showed the child's injuries were "only identifiable after the doctors examined the CAT scans and the MRI." *Id.* The evidence showed the "only outward sign was that [the infant] was irritable, which was easily attributable to recent inoculations the baby had received. In short, there was no evidence that the father witnessed the abuse or that he knew or should have known of the child's injuries as they were not visibly discernible." *Id.* The appellate court's assessment was blunt: "The evidence in this case as regards to the father is neither substantial nor competent. It simply doesn't exist." *Id.* at 1279.

This case is similar. Here, the trial court made no finding on which parent inflicted Markus's rib fractures, or if both parents did. In this posture, the finding of severe child abuse may be affirmed only if the proof shows that both parents' failure to protect Markus was "knowing," i.e., both were aware of facts, circumstances, or information that would alert a reasonable parent to take affirmative action to protect the child, and yet they failed to act. We find no such proof in this record.

We must conclude that the evidence in the record does not clearly and

convincingly show that the failure of Mother and Father to protect Markus from the non-accidental rib fractures was "knowing." Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016) (definition of severe child abuse). We reverse the holding of the trial court and the Court of Appeals as to this ground for termination of parental rights as to both Mother and Father.

*Id.* at 460-72 (footnotes omitted).

We reach the same conclusion in this case. The trial court made no finding on which parent inflicted the abuse, or if both did. It found that Avery "suffered severe abuse while under [Mother's] care" and that "someone horribly abused him." In her oral ruling, the trial judge similarly stated that "somebody abused him horribly. And it's either you, dad, but if not, you were in control of the situation, and you are guilty of severe child abuse. And somebody -- and it -- it looks to me like it's going to be the individuals that take care of him that he only knows." Later, she stated, "Somebody did it, and you're responsible because you were the legal parent who was supposed to be taking care of him along with [Father]." The trial court's finding regarding this ground for termination stated, "As described in the findings hereinabove, *the parents* have committed severe child abuse against the minor child." (emphasis added). We recognize that, as explained in *Markus E.*, "when a child is in the custody of both parents, the structure of the statute does not necessarily require the trial court to determine which parent 'expos[ed]' the child to 'abuse or neglect that is likely to cause serious bodily injury or death' or 'use[d] force on a child that is likely to cause serious bodily injury or death,' or whether both parents did." 671 S.W.3d at 466 (quoting Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (Supp. 2016)). "The definition of 'severe abuse' is in the disjunctive; a parent may be found to have committed severe abuse if the proof shows the parent *either* knowingly inflicted the abuse *or* knowingly failed to protect from the abuse." *Id.* This means that "both parents may be found to have committed severe abuse if the proof shows that at least one of them must have knowingly inflicted the abuse and the other must have knowingly failed to protect from the abuse." *Id.* Again, however, "[t]he catch in this situation is that the proof must show—as to both parents—that even if they didn't actually inflict the injuries to the child, they must have *knowingly* failed to protect the child." *Id.* at 467. In other words, the proof must show the parent "had 'actual knowledge of' the relevant facts, circumstances or information or [was] 'either in deliberate ignorance of or in reckless disregard of' relevant facts, circumstances, or 'information that ha[d] been presented to him or her.'" *Id.* (quoting *In re S.J.*, 387 S.W.3d at 592). The petitioner must show that the parent was "aware of facts, circumstances, or information that would alert a reasonable parent to take affirmative action to protect the child." *Id.* We focus on "what did [the parent] know and when did they know it?" *Id.* So, we consider the "relevant facts and circumstances" known to Mother. *See id.* at 468.

"We look at what the non-perpetrating parent knew or must have known before discovery of the abuse by authorities." *Id.* at 470. Here, Avery was only out of the hospital

- 24 -

and in the care of Mother and Father for two weeks. Mother testified that she never knew about the internal injuries Avery was suffering until the day he went to LeBonheur. Doctors determined that Avery's radius fracture appeared to be "a week or so old," while the femur and tibia fractures appeared to be new. His subdural hemorrhages were also found to be "multiple and in various stages of resolution." Although doctors suspected "more than one episode of nonaccidental trauma," Mother testified that Avery was acting fine until the night he was taken to the hospital. She also testified that she had taken Avery to three doctor appointments earlier that same week, before he was admitted to the hospital on Thursday, including a well-child visit, an appointment regarding his heart, and another visit due to him spitting up, and "he was perfectly fine." Mother also testified that she did not observe anything external such as bulging. There is nothing in the record to show that Mother should have discovered the injuries earlier or suspected that Avery was abused by Father or anyone else. She testified that the police conducted a lengthy investigation and interviewed her and Father but could never determine who committed the abuse. "In cases where our appellate courts have upheld a finding of knowing failure to protect from severe abuse, there was proof that the non-perpetrating parent was presented at the time with facts, circumstances, or information showing that the child had been, or was likely to be, subjected to abuse or neglect. . . . Absent such proof, a finding of 'knowing' failure to protect will not stand." *Id.* at 470-71. The evidence in the record does not clearly and convincingly show either Mother's knowing exposure of the child to abuse, her knowing failure to protect the child from abuse, or knowing use of force on the child. We reverse this ground for termination.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides another ground for termination when:

> A parent [] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

For this ground, two prongs must be proven by clear and convincing evidence: "(1) the parent [] failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

Regarding the first prong, the statute "places a conjunctive obligation on a parent [] to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. So, "[i]f a person seeking to terminate

- 25 -

parental rights proves by clear and convincing proof that a parent [] has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* When considering whether the parent has demonstrated an *ability*, "we focus on 'the parent's lifestyle and circumstances.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). For *willingness*, "we look for more than mere words" and consider whether the parent attempted to overcome the obstacles that have prevented him or her from assuming custody or financial responsibility for the child. *Id.* "The analysis of a parent's failure to manifest an ability and willingness to assume custody or financial responsibility focuses on the parent's actions throughout the life of the [c]hild." *In re Isabella G.*, No. M2022-00246-COA-R3-PT, 2023 WL 1131230, at *12 (Tenn. Ct. App. Jan. 31, 2023) (citing *In re Neveah M.*, 614 S.W.3d at 677).

The trial court found that Mother failed to manifest an ability and willingness to personally assume custody or financial responsibility. It found that Mother had not attempted to obtain custody and demonstrated by her actions and inactions that "she does not desire custody." The trial court found that Mother was granted visitation rights and the right to participate in Avery's medical appointments, yet she failed to engage in more than token visitation. The trial court found that Mother is not capable of parenting the child let alone assuming legal and physical custody. It also found that she failed to assume financial responsibility for the child. The trial court found that Avery has many physical needs and that Mother could not provide for him because she is being evicted and will have no home. We likewise conclude by clear and convincing evidence that Mother has failed to demonstrate an ability or a willingness to personally assume custody or financial responsibility for Avery.

The second prong of this ground for termination requires a showing, by clear and convincing evidence, that "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). Regarding this prong:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Malachi M.*, No. E2020-01114-COA-R3-PT, 2021 WL 1140272, at *6 (Tenn. Ct. App. Mar. 25, 2021) (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL

1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018)).

The trial court found that placing Avery in Mother's legal and physical custody would pose a risk of substantial harm to his physical or psychological welfare. It found that Avery is a special needs child who is currently in a safe home with individuals who properly care for his mental, physical, educational, religious, and emotional needs. The court found that Avery has thrived in Aunt's care and is loved and supported by a large extended family and community. It found that Mother could not provide for Avery, and any attempt to move him to a parent he does not even know would pose a significant risk of substantial harm. We agree that this prong was also proven by clear and convincing evidence. Therefore, we affirm the trial court's finding that this ground for termination was sufficiently proven.

### B. Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). When the termination petition was filed in 2020, Tennessee Code Annotated section 36-1-113(i) provided nine statutory factors to be considered in determining whether termination was in the best interest of the child, which we will set forth in detail below. In addition, our supreme court has explained:

When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration

- 27 -

of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d at 681-82.

The first statutory factor is "[w]hether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian." Tenn. Code Ann. § 36-1-113(i)(1). The trial court found that Mother has not made such an adjustment. It found that Mother failed to acknowledge her role in the severe abuse Avery suffered after being sent home from the hospital with her and failed to obtain training regarding how to care for his severe needs. As for her circumstances, the trial court found that Mother had issues with incarceration, an order of protection against her, divorce, eviction, living in an unsafe neighborhood, and unstable employment. The record fully supports these findings.

The second factor is "[w]hether the parent [] has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2). The trial court found that, rather than adjusting, Mother remained in denial about the severe abuse, had issues with domestic violence, was no longer the primary residential parent for her other children, and failed to take advantage of the services and opportunities that were offered to her by social services, the hospital, and Aunt. The record supports these findings as well.

The third factor considers whether the parent "has maintained regular visitation or other contact with the child." Tenn. Code Ann. § 36-1-113(i)(3). The trial court found that Mother "basically abandoned" the child. It found there was no bonding between them. It also found that Mother made no effort to do what it took to increase her visits. We agree.

Next, we consider "[w]hether a meaningful relationship has otherwise been established between the parent or guardian and the child." Tenn. Code Ann. § 36-1-113(i)(4). The trial court found that "[Avery] does not even know [Mother]," and they have no meaningful relationship. It found that she does not know how to interact with him or meet his mental, physical, emotional, and social needs. The trial court found that Mother had very little working knowledge of Avery's intelligence and articulation. The record supports these findings.

- 28 -

The fifth factor considers "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5). The trial court found that Avery has bonded with Aunt and her extended family and that he has developed bonds with teachers, providers, friends, and church members in his current placement. The trial court found that he would "lose[] everyone he has gained" if he did not remain with his current custodian. The trial court found that Avery needed a safe permanent home and a routine, and his current custodians have a lifetime commitment to him. It found that a change in caretakers would be "emotionally and psychologically devastating" for Avery, and "the child who has taken twenty steps forward would be 20 steps behind." We agree.

The next factor considers whether the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." Tenn. Code Ann. § 36-1-113(i)(6). Regarding this factor, the trial court noted that Avery was adjudicated severely abused in addition to the fact that Mother had issues regarding domestic violence with Father. The record supports these findings.

Next, we consider "[w]hether the physical environment of the parent's [] home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent [] consistently unable to care for the child in a safe and stable manner." Tenn. Code Ann. § 36-1-113(i)(7). Regarding housing, the trial court found that Mother's "housing future is unknown." It found that she does not work consistently and depends on government benefits. It also found that there was domestic violence and criminal activity in the home, as Mother had been incarcerated on a domestic violence charge, and there was an order of protection against her. We agree.

The eighth factor is whether the parent's "mental and/or emotional status would be detrimental to the child or prevent the parent [] from effectively providing safe and stable care and supervision for the child." Tenn. Code Ann. § 36-1-113(i)(8). The trial court found that Mother's "history continues to repeat itself" through her inability to parent her other children and issues with violence. It found that Avery has already suffered adverse childhood experiences and "needs no more." We agree.

Finally, we consider whether the parent has paid child support consistent with the child support guidelines promulgated by the department. Tenn. Code Ann. § 36-1-113(i)(9). The trial court found that Mother has not. We agree.

The trial court went on to list and address the twenty best interest factors that are currently found in the termination statute and made additional findings regarding those. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). The trial court found that Avery has many critical medical needs and that if he missed appointments and services because his

custodian was not trained in how to care for him, "it could be a death sentence." The trial court found that Avery is developmentally delayed and has had difficulty walking and speaking, and Mother simply "cannot handle" his emotional, psychological, and medical conditions, as she has not shown interest in learning about them. The trial court found that Mother's last visit was in 2021 and that she failed to take advantage of the opportunity she had to see Avery at Christmas in 2022 when Aunt reached out about exchanging gifts. The court found that Aunt is providing for Avery's critical needs, "working day in and day out" to help him reach his maximum potential, he has remained with her for about six years, and he is physically improving with the help of his support systems. It found that Avery "is with the family that he knows as mom and dad, although he cannot even say the words, 'mom' and 'dad' because someone abused him." The evidence in the record fully supports these additional findings as well.

Curiously, Mother suggests on appeal that the trial court failed to consider the relevant best interest factors and that "a termination of his rights [sic] warranted a more thorough and in-depth consideration." However, the trial court went through both sets of factors, the previous nine and the current twenty, and made extensive findings in its 33-page order. We find absolutely no support for Mother's argument.

Having carefully reviewed the entire record, we conclude that the proof does not preponderate against the trial court's factual findings, and we conclude that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in the best interest of Avery. *See In re Neveah M.*, 614 S.W.3d at 680. Considering the best interest of the child, from his perspective, it is clear that termination of parental rights is in his best interest. Avery should finally be permitted to achieve permanency in the only home he knows.

## V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby reversed in part and affirmed in part and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Kierria H., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE